(50 Misc. Rep. 450.)

### BROOKLYN UNION GAS CO. v. CITY OF NEW YORK.

(Supreme Court, Special Term, Kings County. May, 1906.)

1. GAS—GAS COMPANIES—REGULATION OF CHARGES.

Where the Legislature grants a gas company the right to collect a maximum rate of compensation for its services, beyond which it may not charge, it is equivalent to granting express authority to charge up to that rate.

[Ed. Note.—For cases in point, see vol. 24, Cent. Dig. Gas, §§ 10–11.]

2. CONSTITUTIONAL LAW—DUE PROCESS OF LAW.

Where the rate fixed by the Legislature as the maximum rate to be charged by a gas company is so low as to work practical destruction of the rights and property of the company, it is deprived of property without due process of law.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Constitutional Law, § 847.]

3. SAME.

Where the Legislature fixes a maximum rate of compensation for a gas company, those for whom the service is performed suffer no impairment of their constitutional rights by a rate that is too high, because they are not compelled to accept the service nor pay for it.

4. DISCOVERY—SUBJECT-MATTER—RELEVANCY—COST OF PRODUCTION OF GAS—GAS COMPANIES—RECOVERY OF COMPENSATION.

In an action by a gas company against a city for gas furnished for lighting its streets, in the absence of a contract fixing the price, the company may recover the maximum rate provided by Transportation Corporations Law, Laws 1890, p. 1149, c. 566, § 70, so that an order granting an examination of plaintiff's books to show the cost of production of the gas and that the price is unreasonable will not be granted.

Action by the Brooklyn Union Gas Company against the city of New York. Application on behalf of defendant for an examination of the books and property of the plaintiff. Application denied.

The action is brought to recover the sum of $135,133.14, alleged to be due the plaintiff from the defendant for gas supplied in lighting public street lamps between the 1st day of January, 1903, and the 16th day of March, 1904.

The complaint alleges:

"Third. That in the portions of the streets or public highways of the borough of Brooklyn, in which at all times hereinafter mentioned the plaintiff carried on the business of supplying illuminating gas for public and private consumption, no individual, nor other corporation, had mains or plant in said territory for the purpose of such supply, and no other corporation or individual

did or could supply illuminating gas for public or private use therein. * * *

"Tenth. That by section 70 of the Transportation Corporations Law, Laws 1890, p. 1149, c. 566, it was provided as follows: 'Price of Gas—In any city in this state having a population of eight hundred thousand or over no corporation or person shall charge for illuminating gas a sum to exceed one dollar and twenty five cents per thousand feet, and such gas shall have an illuminating power of not less than twenty sperm candles, of six to the pound, and burning at the rate of one hundred and twenty grains of spermaceti per hour, tested at a distance of not less than one mile from the place of manufacture, by a burner consuming five cubic feet of gas per hour, and shall comply with the standard of purity now or hereafter established by law; but in any district or ward of any city containing over one million inhabitants, which district or ward is separated from the main portion thereof by a stream or other natural boundary, and any gas light corporation may charge a price not to exceed one dollar and sixty cents per thousand cubic feet, but such corporation shall not charge a greater price in the city where its main works shall be situated than in such district or ward.'

"Eleventh. That during said period from January 1, 1903, to March 16, 1904, the plaintiff supplied illuminating gas to the public generally for private consumption at the rate of $1 for each 1,000 cubic feet; but the said plaintiff makes claim against the city of New York only at the rate or charge of 90 cents for each 1,000 cubic feet by it supplied to the city of New York as hereinbefore alleged. * * *

"Thirteenth. That for the illuminating gas suplied and used as aforesaid, for which the plaintiff makes charge at the rate of 90 cents a thousand cubic feet, the defendant is indebted by virtue of statute to the plaintiff in the sum of $135,133.14 as a balance due, with interest from the 19th day of May, 1905; and that the defendant has neglected and refused to pay the same."

By its answer the city sets up:

"10. That no contract existed between the plaintiff and the defendant for the gas furnished and services rendered between January 1, 1904, and March 16, 1904; that there were no bids called for by the commissioner of water supply, gas and electricity, not submitted by the plaintiff for said period; that no pretense of entering into a contract for this period was ever made by either party.

"11. That the plaintiff, as a public servant or quasi public corporation, was bound to furnish the gas and services during the period from January 1. 1903, to March 16, 1904, and is entitled to recover only the fair and reasonable value of the same, and the defendant has at all times been able, ready, and willing to settle claims duly filed for gas supplied and services rendered, at the fair and reasonable value thereof, as soon as the same can be determined by a court of law, or by agreement between the parties.

"12. That the price claimed by the plaintiff, to wit, 90 cents per 1,000 cubic feet of gas supplied, is above the fair and reasonable value thereof.

"13. That the price mentioned in section 70 of the Transportation Corporations Law [page 1149, c. 566, Laws 1890] and referred to in paragraph tenth of the complaint herein, to wit, $1.25 per 1,000 cubic feet of the quality and pressure therein provided, for the borough of Brooklyn, is greatly in excess of the fair and reasonable price for such material in the borough of Brooklyn during the period set forth in the complaint—January 1, 1903, to March 16, 1904; that by said act the price which an individual or corporation could legally charge for illuminating gas of the standard therein provided was limited for the borough of Brooklyn to a maximum price of $1.25 per 1,000 cubic feet; that said act in nowise regulated or fixed such price as the fair and and reasonable price of such material of the standard therein provided in the borough of Brooklyn during the period set forth in the complaint.

"14. Between the time of the passage of chapter 566, p. 1136, Laws 1890, and the time set forth in the complaint herein, January 1, 1903, to March 16, 1904, the cost of the manufacture and distribution of illuminating gas to the plaintiff has been greatly cheapened by improved methods in production and by great increases in the quantities manufactured and sold, and during said period the reasonable and fair charge or price therefor was less than 70 cents per thousand cubic feet."

It was conceded on the argument of the motion that the defendant is entitled to the examination and inspection sought if the rate fixed by section 70, Transportation Corporations Law, is not binding on the city. If the city has the right in this action to question the reasonableness of the rate charged by the plaintiff under the statute, it is entitled to the examination sought for the purpose of ascertaining what was the actual cost to plaintiff of the production and distribution of gas in the borough of Brooklyn during the period stated in the complaint, plaintiff being a public utility corporation engaged in the manufacture and sale of gas in the borough of Brooklyn, where it enjoys a monopoly of such business in the territory in which it is engaged.

The city claims, as matter of law: (1) At common law a public utility corporation enjoying a monopoly was bound to charge reasonable rates. (2) The Legislature has the power to fix a rate beyond which such corporation could not charge. (3) The authority of the courts to inquire as to the character and effect of rates fixed legislatively, and to prohibit the enforcement against the corporation, if confiscatory, is clear. (4) The court has also the power and authority to pass upon the character and effect of the legislative rate where such rate is claimed to be unreasonable and extortionate by the consumer. (5) The defendant, the city of New York, the largest consumer of the plaintiff's gas, has the right to show, if it can, in an action brought by plaintiff to recover for gas supplied defendant, that the price charged defendant by plaintiff between January 1, 1903, and March 19, 1904, for such commodity is excessive and unreasonable, and that plaintiff is not entitled to recover a judgment for the amount claimed, but can only obtain a judgment for the fair and reasonable price of such commodity. (6) That for the purpose of proving the unreasonableness of the price charged, by ascertaining the actual cost to plaintiff of the production and distribution of gas in the borough of Brooklyn, during the period stated in the complaint, the defendant is entitled to the examination sought.

Dykman & Carr (William J. Carr, of counsel), for plaintiff.

John J. Delany, Corporation Counsel (William P. Burr, of counsel), for defendant.

BURR, J. The form of this application and the stipulation entered into between the parties' eliminate from the consideration of this case every question save one, namely; Is the actual cost of the gas furnished by the plaintiff material to the issues?

It is material unless (1) the Legislature have fixed a price which the defendant may charge the consumer; and (2) the consumer cannot be heard to question the reasonableness of the price so fixed. The Transportation Corporations Law provides as follows:

"In any city in this state having a population of eight hundred thousand or over, no corporation or person shall charge for illuminating gas a sum to exceed one dollar and twenty-five cents per thousand feet  *  *  *  but in any district or ward of any city containing over one million inhabitants, which district or ward is separated from the main portion thereof by a stream or other natural boundary, any gas-light corporation may charge a price not to exceed one dollar and sixty cents per thousand cubic feet, but such corporation shall not charge a greater price in the city where its main works shall be situated than in such district or ward." Laws 1890, p. 1149, c. 566, § 70.

I think that the fair and reasonable construction of the statute is that the fixing of a maximum rate beyond which no charge shall be made is equivalent to express authority to charge up to that rate.

This is so, first, because this is the usual form adopted in statutes regulating the price to be charged for commodities or services by individuals or corporations subject to governmental regulation. "It has

been customary from time immemorial for the Legislature to declare what shall be a reasonable compensation under such circumstances, or, perhaps more properly speaking, to fix a maximum beyond which any charge made would be unreasonable." Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77. "Whenever there is a general right on the part of the public and a general duty of the landowner or any other person to respect such right, we think it is competent for the Legislature, by a specific enactment, to prescribe a precise, practical rule for declaring, establishing, and securing such right and enforcing respect for it." Commonwealth v. Alger, 7 Cush. 53. The Court of Appeals, citing with approval this language of Chief Justice Shaw in this case, adds that the practice in this and other states to prescribe a maximum rate for the transportation of persons or property on railroads is justified upon this principle. People v. Budd, 117 N. Y. 1, 20, 22 N. E. 670, 682, 5 L. R. A. 559, 15 Am. St. Rep. 460.

This is so, in the second place, because, unless the statute is given such force and effect, it is almost meaningless. It certainly is not the "precise and practical" rule referred to by Chief Justice Shaw. Nothing whatever is settled by the statute so far as the consumer is concerned, and very little on the part of the corporation.

In the third place, the language of the section of the statute above quoted, taken as a whole, sustains such a construction. The closing part of the section relates to districts or wards separated from the main portion of the city by a stream or other natural boundary. In such district, says the statute, the company "may charge a price not to exceed one dollar and sixty cents per thousand feet." It would be anomalous to conclude that the Legislature intended to make the price definite as to a district or ward of the city and leave it unsettled and indefinite as to the city at large.

Finally, similar language has been repeatedly construed as authorizing a charge up to the maximum named. Detroit v. Detroit City Ry. Co., 184 U. S. 388, 22 Sup. Ct. 410, 46 L. Ed. 592; Sorrell v. Central R. R. Co., 75 Ga. 509; Winsor Coal Co. v. Chicago & Alton R. R. Co. (C. C.) 52 Fed. 716; Fisher v. N. Y. Central R. R. Co., 46 N. Y. 644; Johnson v. H. R. R. R. Co., 49 N. Y. 455. It is true that in the Detroit Case the court construed a legislative contract, arising from a clause contained in the franchise of the company that the rate of fare for a single trip should not exceed 5 cents for any distance within the city limits. Subsequently an ordinance was passed reducing the rate of fare and the railroad company brought an action to enjoin the enforcement of the ordinance as an infringement upon their contract rights. The court said that "a contract which provides that the rate of fare for any passenger shall not be more than 5 cents is a contract which gives the company the right to charge a rate of fare up to the sum of 5 cents." If that is the meaning of such words when used in a legislative contract, it must also be the meaning of similar words when used in a legislative act.

In Johnson v. H. R. R. R. Co., it appeared that the defendant was organized under a special charter granted in 1846 (Laws 1846, p. 272, c. 216, as amended Laws 1850, p. 14, c. 9). By this it was prohibited

from charging for transportation of persons more than 2½ cents a mile for four months in the year, and 2 cents a mile for the rest of the year. A general railroad law passed in 1848 (Laws 1848, p. 228, c. 140, § 19, subd. 9) provided that corporations organized under that act might charge not exceeding 3 cents a mile. By an amended act passed in 1850 (Laws 1850, p. 235, c. 140, § 49) the powers and privileges contained in the general railroad law were conferred upon all existing corporations. Thereafter defendant charged plaintiff for transportation at the rate of 3 cents a mile. In an action brought by him under the extortion act (Laws 1857, p. 432, c. 185) the court held that the action would not lie. The result only could have been reached upon the theory that privilege to charge not more than 3 cents a mile conferred an express right to charge that amount, which, being inconsistent with the special provision of defendant's charter, prohibiting it from charging more than 2½ cents a mile, impliedly repealed the same. I conclude, therefore, that the first question must be answered in the affirmative.

In order to correctly determine whether the defendant can question the reasonableness of the rate fixed by the statute it is necessary to ascertain, if possible, the ground upon which the state assumes to act as between the plaintiff, the producer, and the defendant, the consumer, in regulating the price to be charged and fixed. As a general rule, every man may fix what price he pleases upon his own property, or upon the use of it, or may refuse to dispose of it at any price. But when private property is affected with a public interest it ceases to be juris privati only. Property does become clothed with a public interest when used in a manner to make it of public consequence and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he in effect grants to the public an interest in that use, and must submit to be controlled by the public for the common good to the extent of the interest he has thus created. Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; C., B. & Q. R. R. Co. v. Iowa, 94 U. S. 155, 24 L. Ed. 94; Peik v. Chicago R. R. Co., 94 U. S. 164, 24 L. Ed. 97. In obedience to this principle from time immemorial in England, common carriers, wharfingers, innkeepers, and ferrymen were not only obliged to serve the public, but to serve them at reasonable rates. This was entirely independent of the fact that such business was frequently carried on by individuals or corporations who had received special license or privilege from the Crown. The obligation was inherent in the nature of the business. People v. Budd, 117 N. Y. 1, 16, 22 N. E. 670, 682, 5 L. R. A. 559, 15 Am. St. Rep. 460. Otherwise it would be impossible to answer the dissenting opinion of Mr. Justice Field in Munn v. Illinois, supra. That the plaintiff is engaged in a business of that character, a business which, for want of a more precise definition, is known as a "public utility," is conceded. But its liabilities, so far as the question here involved is concerned, are no different from that which would attach to a partnership or an individual carrying on the business of supplying gas to the public to a similar extent and under like conditions. The right of governmental control being conceded to the extent that the

public are entitled to be served with gas, and that at a reasonable rate, how is governmental control to be exercised? Naturally, through legislative action establishing what shall be a reasonable rate. In Munn v. Illinois, 94 U. S. 133, 24 L. Ed. 77, the court says:

"It is insisted that what is reasonable is a judicial and not a legislative question. As has already been shown, the practice has been otherwise. Undoubtedly in mere private contracts relating to matters in which the public has no interest, what is reasonable must be ascertained judicially, but this is so because the Legislature has no control of such a contract. So, too, in matters which do affect the public interest and as to which legislative control may be exercised, if there are no statutory regulations upon the subject the courts must determine what is reasonable."

The determination of the reasonable rate being, therefore, legislative in character, if the Legislature has acted, its determination is final and conclusive to the same extent as any other legislative act, so long as no constitutional principle is violated. The Munn Case was decided in 1876. For some years after that the struggle continued against the principle of governmental control of public utilities when controlled by individuals and not by corporations existing under legislative sanction. The principle asserted in that case was, however, firmly adhered to, and is irrevocably established. The first suggestion that the legislative determination was not in all cases conclusive appeared in 1885 in the railroad commission cases. Stone v. Farmers' Loan & Trust Co., 116 U. S. 307, 331, 6 Sup. Ct. 334, 345, 29 L. Ed. 636. The court then says:

"From what has thus been said it is not to be inferred that this power of limitation or regulation is itself without limit. This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretense of regulating fares and freights, the state cannot require a railroad corporation to carry persons or property without reward; neither can it do that which in law amounts to a taking of private property for public use without just compensation, or without due process of law."

In 1890 the question was again presented in an action brought to enjoin the enforcement of an act of the Legislature of the state of Minnesota, fixing the rate of charges for carrying milk. Chicago, Milwaukee & St. Paul R. R. Co. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 33 L. Ed. 970. This review was sought at the suit of the common carrier. This was followed by Reagan v. Farmers' L. & T. Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Smythe v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; San Diego Land & Town Co. v. National City, 174 U. S. 739, 19 Sup. Ct. 804, 43 L. Ed. 1154; Cotting v. Kansas City Stockyards Co., 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92; Stanislaus County v. San Joaquin C. & I. Co., 192 U. S. 201, 24 Sup. Ct. 241, 48 L. Ed. 406. From these decisions this principle is evolved. The fixing of a tariff of charges is primarily a legislative or adminstrative rather than a judicial function. But the courts have the duty to inquire whether a body of rates prescribed by the Legislature is so unjust and unreasonable as to work a practical destruction to rights of property at the suit of those whose property rights are affected. If it is found so to be, if, for instance, the effect is to compel the public utility company to transact its business at a loss, so that its capital is impaired and its investment destroy-

ed in whole or in part, then it is being deprived of its property without due process of law, and its constitutional rights are infringed. The courts will interfere against such legislative confiscation because it is unconstitutional. In the Reagan Cases the court says (page 410 of 154 U. S., page 1059 of 14 Sup. Ct. [38 L. Ed. 1014]):

"If the state were to seek to acquire the title to these roads, * * * is there any doubt that constitutional provisions would require the payment to the corporation of just compensation, that compensation being the value of the property as it stood in the markets of the world, and not as prescribed by an act of the Legislature? Is it any less a departure from the obligations of justice to seek to take, not the title, but the use for the public benefit at less than its market value?"

In Smythe v. Ames, 169 U. S. 526, 18 Sup. Ct. 426, 42 L. Ed. 819, the court says:

"Whether rates are so unreasonably low as to deprive the carrier of its property without such compensation as the Constitution secures, and therefore without due process of law, cannot be so conclusively determined by the Legislature of the state that the matter may not become the subject of judicial inquiry."

In that case the court below set aside the rates solely upon the ground that they were in violation of constitutional rights, and their judgment was affirmed. In the case of San Diego Land Company, 174 U. S. 754, 19 Sup. Ct. 810, 43 L. Ed. 1154, the court says:

"Can it be said that the rates in question are so unreasonable as to call for judicial interference in behalf of the appellant? Such a question is always an embarrassing one to a judicial tribunal, because it is primarily for the determination of the Legislature, or of some public agency designated by it. But when it is alleged that a state enactment invades or destroys rights secured by the Constitution of the United States a judicial question arises, and the courts, federal and state, must meet the issue, taking care always not to entrench upon the authority belonging to a different department nor to disregard a statute unless it be unmistakably repugnant to the fundamental law."

There doubtless are expressions in some of the opinions, even of the United States Supreme Court, which, taken without reference to the context, or the facts under consideration, might seem to indicate that this was not the sole ground of jurisdiction. For instance, in the Minnesota milk cases the court says:

"The question of the reasonableness of a rate charge for transportation by a railroad company, involving as it does the element of reasonableness both as regards the company and as regards the public, is eminently a question for judicial investigation, requiring due process of law for its determination."

In the Reagan Case the court says:

"The province of the courts is not changed, nor the limit of judicial inquiry altered, because the Legislature, instead of the carrier, prescribes the rates."

But a careful study of the opinions shows that all that the court meant by these expressions was that if it was claimed by any one that the rate was so unreasonable as to infringe upon a constitutional right, the determination of the Legislature that it did not so infringe was not final and conclusive, but the court could review the legislative action to that extent. See Reagan Cases, 154 U. S. 399, 14 Sup. Ct.

1055, 38 L. Ed. 1014; New Memphis Gas Light Co. v. City of Memphis (C. C.) 72 Fed. 952; St. Louis & San Francisco R. R. Co. v. Gill, 156 U. S. 649, 657, 15 Sup. Ct. 484, 39 L. Ed. 567; C. & L. Turnpike Co. v. Sandford, 164 U. S. 578, 593, 17 Sup. Ct. 198, 41 L. Ed. 560.

If, then, the test of the right to interfere with legislative acts fixing rates is whether any constitutional right of the parties affected thereby is impaired, it remains to consider whether any constitutional right of the defendant has been invaded. If so, it is entitled to relief against such invasion; otherwise, not. As has been seen, a rate which would result in forcing an individual or corporation engaged in a business of public utility into insolvency would be depriving him or it of property without just compensation and without due process of law. But no matter how unreasonable to the consumer the rate which the Legislature has prescribed, has any constitutional right of such consumer been invaded thereby? It seems to me not. His personal liberty has not been invaded, because he is under no obligation to purchase the gas. It is true that in the case of a municipal corporation like the city of New York, under an obligation to its citizens to exercise reasonable care to make its streets safe by lighting the same, the pressure of circumstances might operate almost as strongly as a legal obligation to compel it to purchase gas. But still the obligation to purchase gas is not a legal one. There is no absolute duty upon the consumer to take. The city might adopt other means of lighting its streets, or perhaps take the risk of leaving them unlighted; and the company, in the absence of a contract, could not compel them to purchase gas. The company is bound to furnish; the city is at liberty to take.

In the next place, the defendant, the consumer, is deprived of no property by the statute in question. It has no capital invested which would be destroyed by the exaction of an unreasonable rate. The mere fact that it paid, in obedience to the statute, a higher rate than it thinks reasonable, or than a court under all the circumstances might think reasonable, does not result in depriving it of its property to the extent of the difference between a reasonable rate and the one fixed, because the use of the commodity is voluntary. It is true it is the right of the defendant, the consumer, to have gas furnished to it at a reasonable rate. But this is originally a common-law right, although to some extent confirmed by statute. But this is not a property right so long as it is a right in expectancy. So long as the right to be charged a reasonable sum has not become vested by reason of services rendered prior to the statute fixing the rates, it is subject to legislative change. Private rights may be interfered with so long as they are not vested. Cooley, Const. Lim. (6th Ed.) 435. A right is not vested unless it is something more than such a mere expectation as may be based upon an anticipated continuation of the present general laws. Cooley, Const. Lim. (6th Ed.) 438. At common law the husband, immediately on marriage, succeeded to certain rights in the real and personal property which his wife then possessed. But as to subsequent marriages, a statute might take away, as it has done in this state, very many of those rights. So with regard to dower. At least as

to marriages subsequently contracted, there is no doubt of the power of the Legislature to limit, or even absolutely take away, the present right of dower.

Again, the citizen has no vested rights in statutory privileges or exemptions. Cooley, Const. Lim. (6th Ed.) 471. I cannot see why it is not within the power of the Legislature to repeal every statutory requirement respecting the obligations of persons engaged in business of the character of that of the plaintiff, and to pass a statute annulling the old common-law rule and providing that so far as the consumer is concerned such persons should be obliged to contract only with those with whom they desire to contract and upon such terms as should be mutually satisfactory. If the Legislature can, by statute, utterly destroy the common-law right of the consumer, a statute which at the most only impairs without destroying that right is not in violation of any constitutional provision for the benefit of the consumer, and he cannot be heard to complain respecting the same. The distinction between the right of the public utility corporation and the consumer to review legislative action fixing rates is that, in the case of the former, constitutional rights may be affected by an unreasonable rate. In the case of the latter they cannot be. The consumer is not left under such circumstances at the mercy of a public utility corporation. But he must seek his protection through the Legislature and not through the courts.

The people of this state have by a written Constitution separated and distributed governmental powers among the three departments of government created by it, the executive, legislative, and judicial, carefully enumerating such powers and defining their limitations. Matter of Guden, 171 N. Y. 529, 64 N. E. 451. The temptation is not infrequently offered to the judiciary to infringe upon the powers and prerogative of the other branches of the government. In no form is the temptation more insidious than when accompanied by a suggestion that the rights of the people have been sacrificed and that it is necessary that the judicial branch of the government should review and correct the wrong that has been done. The temptation should be firmly resisted. "For protection against abuses by Legislatures the people must resort to the polls, not to the courts." Munn v. Illinois, supra. It is gratifying to observe how promptly of late the Legislature has responded to the demands of an awakened and enlightened public sentiment in remedying wrongs.

The application must be denied.