THE CITY OF NEW HAVEN *v.* THE NEW HAVEN WATER COMPANY.
THE NEW HAVEN WATER COMPANY *v.* THE CITY OF NEW HAVEN.

MALTBIE, C. J., BROWN, JENNINGS, ELLS and DICKENSON, Js.

Argued November 7, 1945—decided January 9, 1946.

*Vincent P. Dooley* and *A. Frederick Mignone,* for the City of New Haven.

*Arthur L. Corbin, Jr.,* with whom were *William B. Gumbart* and *J. Stephen Knight,* for the New Haven Water Company.

MALTBIE, C. J. These cases, coming to us on reservation, are appeals from orders of the public utilities commission with reference to rates of payment for water furnished by the New Haven Water Company to the city of New Haven and several neighboring towns, and to their inhabitants. On August 8, 1939, the company filed with the commission an amended schedule increasing the rates to be charged by it, to go into effect November 1, 1939, and in a letter to the commission transmitting the schedule it stated that it "would like" to put it into effect on that date. On August 14,

1939, the commission, without giving to interested parties notice or an opportunity to be heard, made an "order" which may be summarized as follows: It recited that in October, 1938, the company had "presented" to the commission a report, prepared by its engineer, on "a proposed revision of the Company's rates"; then had followed a series of conferences between the commission and representatives of the company and the commission had caused a "full study" of the finances and operations of the company to be made by its own engineers and accountants; as a result of that study and of reports by the company's engineer, the company had modified its proposed schedule; a summary of the results of the investigation was given; and the commission concluded that it "now finds no occasion to suspend the effective date of the amended rate schedule as now filed." On September 14, 1939, the city first learned of the proposed increase in rates from an advertisement published by the company, and its corporation counsel wrote the commission requesting that a public hearing be held and that, until that hearing, the effective date of the order it had made be suspended. As a result the commission, on October 13, 1939, wrote the company asking assurance by it that it would maintain its books of account in such a way that, in the event of a finding by the commission, or by a court on appeal, against the increase, it could refund to its customers any excess charged above the then existing rates; in reply, the president of the company wrote that it would keep its books in that way; his action was later ratified by the board of directors of the company; and the commission then wrote counsel for the city and the company stating that upon the basis of that assurance it "may not suspend" the effective date of the amended schedule. The city took no further action and the commission

held no hearing. Beginning on November 1, 1939, the company proceeded to collect payments from its customers at the increased rates.

On July 25, 1941, the commission, in pursuance of a direction from the governor given under the provisions of § 1414c (d) of the General Statutes, Cum. Sup. 1935, issued notice of a hearing for the purpose of determining whether the amended rate schedule of the company was unreasonably discriminatory or more or less than just and reasonable. Hearings were held in pursuance of that notice, limited, however, to a determination of a motion made by the city asking that the commission declare that all charges by the company since November 1, 1939, in excess of the rate schedule previously in force were illegal, and seeking an order that the excess above the rates in existence before that date be refunded, that the company be required to file any proposed schedule of increased rates with the commission, and that it suspend the effective date of such a schedule pending a full hearing at which all interested parties should have an opportunity to appear. The commission, on October 20, 1941, revoked its "order" of August 14, 1939, in which it found no occasion to suspend the effective date of the amended schedule; and it ordered that the company should, with certain exceptions, re-establish the rate schedule in effect before November 1, 1939, with provision that the order become effective as to bills rendered by it on and after January 1, 1942, and that the company should continue to retain the revenues collected by it from November 1, 1939, to January 1, 1942, in excess of the schedule in effect before the former date, pending a final order of the commission after an investigation it was carrying on. Within the thirty days allowed by § 3608 of the General Statutes, the company appealed from that order to the Superior Court. In an appeal

to the Superior Court taken by the city under date of August 19, 1943, this order is also included, but the time to appeal from it had then long passed, and to the extent that the appeal was taken from this order it has no standing before us; as, however, the validity of the order is necessarily involved in the appeal taken by the city from the final order of the commission, referred to below, we merely note this in passing. Under § 3612 of the General Statutes, the appeal of the company acted as a supersedeas of the order, thus enabling the company to continue to collect payments in accordance with the amended rate schedule.

The commission thereafter held extended hearings and, on June 21, 1943, issued its final order, in which it held that the amended rate schedule in effect since November 1, 1939, had not been and was not more than just, reasonable and adequate under the provisions of § 1414c (d) of the Cumulative Supplement of 1935 and that the company need not make any refund to its customers of any charges collected since that date. The city appealed to the Superior Court from this order, and that is the other case now before us. The city's claim is, however, restricted to that portion of the order freeing the company from any obligation to make a refund. It maintains that the company has no right to retain the amounts collected by it in excess of the rate schedule in force before November 1, 1939. In support of that contention, it makes alternate claims, first under the provisions of § 3599 of the General Statutes, which deals with the powers of the commission over rates existing or charged pursuant to contract, and, secondly, under § 1414c (d), which deals generally with the authority of the commission over the rates of public utility companies.

Section 3599 reads: "Whenever any rate of any public service company chartered by or organized under

the laws of this state shall exist or shall be charged pursuant to charter, contract or any agreement or understanding, and shall be in whole or in any respect discriminatory or more or less than just, reasonable and adequate to provide properly for the public convenience, necessity and welfare, such company or any town, city or borough within which or between which and any other town, city or borough in this state, any such company is furnishing service, or any ten patrons of any such company, may bring a written petition to the commission alleging that such rate is discriminatory or more or less than just, reasonable and adequate. Thereupon the commission shall fix a time and place for a hearing upon such petition and shall mail notice thereof to the parties in interest and give due public notice thereof at least one week prior to such hearing. Upon such hearing, the commission may, if it shall find such rate to be discriminatory or more or less than just, reasonable and adequate to enable such company to provide properly for the public convenience, necessity and welfare, determine and prescribe just and reasonable maximum rates or charges to be thereafter made by such company." Under this statute, at least as applied to the first instance, where a company desires to increase its rate schedule above that specified in a contract with any city, it could do so only by petition to the commission, a finding by it that there was ground for increased charges and an order prescribing the rates to be thereafter charged. *Wichita R. R.* v. *Public Utilities Commission,* 260 U. S. 48, 57, 43 Sup. Ct. 51; *Commonwealth* v. *Shenandoah R. L. Corporation,* 135 Va. 47, 73, 115 S. E. 695. If this statute applies in the situation before us, the company had no right to put into effect the increased rates prior to the order of the commission made on June 21, 1943,

and the excess charges above those permitted before November 1, 1939, were illegally collected.

On February 17, 1902, the company entered into a contract with the city, indefinite in duration, to furnish water to it and its inhabitants at specified rates, subject to future modification only to a limited extent. At the next General Assembly a special act was passed making the contract obligatory upon the city and company, as though specifically authorized in their respective charters. 14 Spec. Laws 276; see *New Haven Water Co.* v. *New Haven,* 131 Conn. 456, 459, 40 Atl. (2d) 763. In 1927, the company brought an action against the city for a declaratory judgment and one of the questions asked was whether the rates prescribed in the contract were unalterable or were subject to be increased by the commission if it found that they were discriminatory or more or less than just, reasonable and adequate. The action came before us on reservation. *New Haven Water Co.* v. *New Haven,* 106 Conn. 562, 139 Atl. 99. We had previously decided the case of *Ansonia* v. *Ansonia Water Co.,* 101 Conn. 151, 125 Atl. 474. In that case the defendant water company had, in 1918, entered into a contract to maintain fire hydrants in the plaintiff city for a term of ten years at an agreed rate. The public utilities commission, on the petition of the company filed in 1922, fixed an increased rate for the hydrant service. The city appealed to the Superior Court and the case was reserved. We sustained the ruling of the commission, holding that the statute, then chapter 328 of the Public Acts of 1921 and now § 3599, was valid and applied to contracts made before its passage. See *Producers Transportation Co.* v. *R. R. Commission,* 251 U. S. 228, 232, 40 Sup. Ct. 131; notes, 3 A. L. R. 738, 9 A. L. R. 1165, 28 A. L. R. 587. In the *New Haven Water Co.* case, supra (106 Conn. 562, 139 Atl. 99), citing that deci-

sion, we held in answer to one of the questions propounded (p. 581) that "The rates fixed in and by the contract may be increased or lowered by the Public Utilities Commission upon their finding that the duration of the contract is an unreasonable one and that the rates charged are not fair and reasonable to the New Haven Water Company, and thereupon they may fix a reasonable period for the duration of these rates and fix reasonable rates."

Following that decision, the company, in 1931, filed with the commission a schedule of rates to be charged in towns which it served but with which it had no contract and a petition asking the commission, if it should find the existing rates charged within the city to be discriminatory or more or less than just, reasonable and adequate, to determine and prescribe just and reasonable maximum rates. The commission, finding the duration of the contract to be unreasonable and the rates specified in it to be discriminatory and less than just, reasonable and adequate, prescribed a schedule of rates the company might charge. An appeal was taken by the city to the Superior Court, which overruled the commission; the company appealed to this court and we found error and remanded the cause to the Superior Court with direction to dismiss the appeal taken to it. *New Haven* v. *New Haven Water Co.,* 118 Conn. 389, 172 Atl. 767.

The city contends that the effect of the order on the 1931 petition was to amend the contract by substituting for the rates fixed in it those prescribed by the commission, so that the latter have become a part of it. The answer to this contention is found in the basis upon which rests the power of the commission to prescribe higher rates than those fixed in a contract between a utility company and a municipality, as it is explained in *Ansonia* v. *Ansonia Water Co.,* supra, in

*New Haven Water Co.* v. *New Haven,* supra (106 Conn. 562, 139 Atl. 99), and in the cases cited in those opinions. A state may, within certain limitations, authorize a municipal corporation to establish by contract the rates to be charged by a public service corporation, and the effect of such a contract is to suspend, during its life, the governmental power of fixing and regulating rates; if, however, the contract provision fixing rates transcends these limits it must give way, because it conflicts with the proper exercise of police power by the state. See *Opinion of the Justices,* 293 Mass. 589, 600, 199 N. E. 538; *Springfield Consolidated Water Co.* v. *Philadelphia,* 285 Pa. 172, 174, 131 Atl. 716; *Railroad & Light Co.* v. *Court of Industrial Relations,* 113 Kan. 217, 229, 214 Pac. 797.

Of the contract now before us, we said in *New Haven Water Co.* v. *New Haven,* supra (106 Conn. 562, 139 Atl. 99), at page 576: "A provision for the indefinite duration of the contract as to the water company is a surrender of the police power and beyond the power of the General Assembly to itself grant, or to delegate the power to grant, to a municipality." The effect of the decision was that the stipulation as to rates in the contract was void as an improper limitation upon the police power of the state. Courts have, in similar situations, used varying language; in *Louisville & Nashville R. Co.* v. *Mottley,* 219 U. S. 467, 485, 31 Sup. Ct. 265, it was said that the contract rates were thereafter unenforceable; in *Union Dry Goods Co.* v. *Georgia Public Service Corporation,* 248 U. S. 372, 375, 39 Sup. Ct. 117, and *Minneapolis, St. P. & S. S. M. R. Co.* v. *Menasha W. W. Co.,* 159 Wis. 130, 134, 150 N. W. 411, they were spoken of as "superseded"; in *Commonwealth* v. *Shenandoah R. L. Corporation,* supra, 63, the contract provision was spoken of as having been terminated and (p. 68) the rates

fixed in it as "illegal"; but these expressions have the common meaning that the contract provision no longer has validity. When upon the petition of the company in 1931 the commission prescribed increased rates, its action was not taken in amendment of the contract; as the contract provision was void it was incumbent upon the commission to establish just and fair rates. It derived its power "not from the agreement of the parties . . . but from the state legislature." *Central Kentucky Co. v. Commission*, 290 U. S. 264, 270, 54 Sup. Ct. 154. The rates fixed by it did not, in the words of § 3599, "exist," and were not thereafter "charged" pursuant to the contract. Whether or not the company acted illegally in collecting charges above those in effect before November 1, 1939, must be determined by the application to the situation of the general powers of the commission over rates vested in it by § 1414c (d).

Our statute for the general regulation of public service companies was first enacted as chapter 128 of the Public Acts of 1911. Section 23 of that act, in so far as it governed rates, provided as follows: "Any town, city or borough within which, or between which and any other town, city, or borough in this state, any public service company is furnishing service, or any ten patrons of any such company, or any such company furnishing service in accordance with, or at rates prescribed by, an order of the commission, may bring a written petition to the commission alleging that the rates or charges made by such company or prescribed by the commission are unreasonable. . . . Thereupon the commission shall fix a time and place for a hearing upon such petition, and shall mail notice thereof to the parties in interest and give due public notice thereof at least one week prior to such hearing. Upon said hearing the commission may, if it finds such rates and

charges to be unreasonable, or such service to be inadequate or excessive, determine and prescribe an adequate service to be thereafter furnished or just and reasonable maximum rates and charges to be thereafter made by such company, and such company . . . shall not thereafter demand any rate or charge in excess of the maximum rate or charge so prescribed." This statute became § 3635 of the Revision of 1918.

In 1929 the section was re-enacted except that "the state, under the direction of the governor" was added as a party who might bring a written petition to the commission. Public Acts, 1929, Chap. 199. In that form it appeared as § 3597 of the Revision of 1930. In 1935 it was replaced by the law printed as § 1414c (d). That requires every public utility company to file with the commission "any proposed amendment of its existing rate schedule"; and it then proceeds: "The commission may, if, in its opinion, such action shall appear necessary or suitable in the public interest and, upon written petition or complaint of the state, under direction of the governor, shall make such investigation of such schedule of rates or proposed amendment as may, in the opinion of the commission, be necessary to determine whether the rates specified in any schedule are unreasonably discriminatory or more or less than just, reasonable and adequate. . . . If the commission shall find any rate to be unreasonably discriminatory or more or less than just, reasonable and adequate to enable such company to provide properly for the public convenience, necessity and welfare, it may determine and prescribe . . . just and reasonable maximum rates and charges to be made by such company. The commission may, in its discretion, pending its conclusion upon an amendment increasing any rate, suspend the effective date of such increase unless the company shall file with the commission assurance satisfactory to

the commission of the company's ability and willingness to refund to its customers such amounts as it may collect from its customers in excess of the rates fixed by the commission and at the conclusion of any appeal which may be taken as a result of a finding by the commission."

The significant changes brought about by this statute are that, on the one hand, the commission is expressly given power to make investigations upon its own initiative, but that, on the other, only "the state, under direction of the governor," is given power to petition it to do so; that the test to be applied in determining whether a rate schedule is proper is differently and more precisely stated; that the commission is given a discretionary power to suspend the effective date of a proposed increase unless the company files certain assurances with it; and that the provision requiring the company not thereafter to demand a greater rate than one prescribed by the commission was omitted. Section 1414c (e) requires the commission to fix a time and place "for all hearings" and to give notice to interested parties and the public.

The 1935 act does not change the essential functions of the commission as they had before existed. Our law, unlike the public utility laws in many jurisdictions, does not in general condition the establishment of a changed rate schedule by a utility company upon prior approval by the commission. All a company desiring to put into effect a changed rate schedule needs to do in the first instance is to file it with the commission. There is no obligation upon the company to apply to the commission for an order that the effective date of the schedule shall not be suspended, or upon the commission to make an order directing whether or not it shall be suspended, but, unless in the exercise of the power vested in it, expressly made dis-

cretionary, it does so order, the schedule becomes effective at the time fixed in it. The statute does not make it obligatory upon the commission to make an investigation unless a written complaint is made to it, although it may decide to do so upon its own initiative. The words "pending its conclusion" in the provision giving it power to suspend the effective date imply that it has so decided or that a written complaint has been made to it. The making of the order is expressly conditioned upon the failure of the company to file with the commission assurance satisfactory to it of the company's ability and willingness to refund any excess charges, and if such assurance is filed the commission is without authority to make an order of suspension. Even after the schedule of rates has become effective upon filing with the commission, it may, as the result of information coming to it, make an order under the provision for suspension. An order of suspension does not invalidate charges previously collected by the company; if assurance of its ability and willingness to refund is given, the company can legally proceed thereafter upon the basis of the schedule it has filed; its only obligation would be, if ultimately the commission finds cause to and does prescribe lower rates, to refund any excess it had collected above those rates. It is necessarily implied in the provision that the commission can make an order establishing rates retroactive to the time when it determines that unless proper assurance is given by the company the effective date of the new rate schedule will be suspended; if this were not so there would be no reason for the giving of such assurance. It is also necessarily implied that any obligation of the company to refund cannot extend back beyond the date of the order as to the suspension, for the commission might determine on its own initiative to make an investigation or a complaint might be made to it

years after the new rate schedule was filed, and it cannot be that the legislature would intend to require a refund as to rates which the company had no reason to believe would be called in question. The commission cannot make an order prescribing rates in lieu of those in a schedule filed by the company until it has found that the rates stated in the schedule are unreasonably discriminatory or more or less than just, reasonable and adequate.

In the regulation of public utility rates, the state is exercising its police power. *Union Dry Goods Co.* v. *Georgia Public Service Corporation,* supra, 374; *Ansonia* v. *Ansonia Water Co.,* supra, 156; *New Haven Water Co.* v. *New Haven,* 106 Conn. 562, 571, 139 Atl. 99; *Raymond Lumber Co.* v. *Raymond L. & W. Co.,* 92 Wash. 330, 335, 159 Pac. 133. The extent to which and the methods by which it will exercise that power rest in the determination of the legislature. *State* v. *Kievman,* 116 Conn. 458, 464, 165 Atl. 601; *Los Angeles Gas Co.* v. *R. R. Commission,* 289 U. S. 287, 304, 53 Sup. Ct. 637. This is illustrated by the fact that previous to the enactment of chapter 128 of the Public Acts of 1911 there was no statute generally regulating the rates of public utility companies. Our legislature has seen fit not to require that rates to be charged by public utility companies be approved by the commission before they become effective. Of a similar provision in the New York statutes, it is said in *North Hempstead* v. *Public Service Corporation,* 231 N. Y. 447, 450, 132 N. E. 144: "This method of increasing rates without first obtaining an adjudication as to their reasonableness may appear defective and illogical, but no constitutional limitation on legislative power interdicts it." See also *Public Service Commission* v. *Pavilion Natural Gas Co.,* 232 N. Y. 146, 151, 133 N. E. 427. The power given to the commission to make in-

vestigations upon its own initiative does not imply that, in the course of them, it must hold hearings at which interested parties may appear, and it is only when the commission has in its discretion concluded that it must consider action which will affect the vested rights of individuals or corporations, or when formal proceedings have been instituted before it, that it must give hearings with notice as provided in § 1414c (e). *Bowles* v. *Baer*, 142 Fed. (2d) 787, 788; *In re Securities & Exchange Commission*, 84 Fed. (2d) 316, 317. As a matter of public policy, we heartily subscribe to the doctrine stated in *Morgan* v. *United States*, 304 U. S. 1, 14, 58 Sup. Ct. 773, cited to us by the city: "The first question goes to the very foundation of the action of administrative agencies entrusted by the Congress with broad control over activities which in their detail cannot be dealt with directly by the legislature. The vast expansion of this field of administrative regulation in response to the pressure of social needs is made possible under our system by adherence to the basic principles that the legislature shall appropriately determine the standards of administrative action and that in administrative proceedings of a quasi-judicial character the liberty and property of the citizen shall be protected by the rudimentary requirements of fair play. These demand 'a fair and open hearing,'—essential alike to the legal validity of the administrative regulation and to the maintenance of public confidence in the value and soundness of this governmental process. Such a hearing has been described as an 'inexorable safeguard.' " Unless, however, action by the commission would run counter to some constitutional guaranty, the courts cannot require it to hold hearings where the legislature has not seen fit to do so.

The city, none of the property of which is taken by

any order of the commission in these proceedings and which is a mere agency of the state, created by it, is not in a position to claim protection of constitutional guaranties against the provisions of a law duly enacted by its creator; *State ex rel. Bulkeley* v. *Williams*, 68 Conn. 131, 156, 35 Atl. 24, 421; *Williams* v. *Mayor*, 289 U. S. 36, 40, 53 Sup. Ct. 431; and see *Winchester* v. *Cox*, 129 Conn. 106, 110, 26 Atl. (2d) 592; nor does an inhabitant of the city have any vested rights which are affected by action of the commission over rates in the exercise of the governmental power given to it by the legislature; he "has only such right as the Public Service Law gives him to complain of charges or service." *U. S. Light & Heat Corporation* v. *Niagara Falls G. & E. L. Co.*, 47 Fed. (2d) 567, 570; *Brooklyn Union Gas Co.* v. *New York*, 50 Misc. 450, 461, 100 N. Y. S. 570. For this reason we merely note in passing the claim of the city that § 1414c (d) is invalid as a delegation of power to the commission because it fails to establish with sufficient definiteness standards or principles to be applied by it in passing upon public utility rates. See *State* v. *Stoddard*, 126 Conn. 623, 628, 13 Atl. (2d) 586. This claim is palpably without foundation. *Morgan* v. *United States*, 298 U. S. 468, 479, 56 Sup. Ct. 906; *Power Commission* v. *Pipeline Co.*, 315 U. S. 575, 585, 62 Sup. Ct. 736; *Yakus* v. *United States*, 321 U. S. 414, 423, 64 Sup. Ct. 660.

The action of the company in October, 1938, in presenting to the commission a report upon a proposed revision of its charges was evidently a preliminary step to and not the filing of an amended rate schedule. That was not filed until August 8, 1939. There was no occasion for the "order" of August 14, 1939, in which the commission found no cause to suspend the effective date of the schedule; unless and until it decided

to suspend the effectiveness of the rates because of lack of assurance by the company of its ability and willingness to make a refund, the schedule was effective from the date set in it; and the action of the commission neither added to nor took from the force attending its filing. The "order" was in legal contemplation a nullity. The letter to the commission from the counsel of the city asking for a hearing and an order suspending the effective date of the schedule was not such a complaint as under the statute it was bound to heed. The letter imposed no duty upon it to hold a hearing unless in its discretion it decided to do so; and, in view of its acceptance of assurance given by the company of its willingness to make refunds, the commission could not properly have then suspended the effective date of the schedule. Its request in its letter to the company that the latter so keep its books of account that if the commission should ultimately find the rates stated in the schedule improper the company could make a refund, and its acceptance of the reply of the company that it would do so, cannot be given the effect of an order made under the provision concerning the suspension of the effective date set in the schedule. Had the commission refused to direct the suspension of the effective date of the schedule in lack of proper assurance by the company, the commission could, no doubt, upon hearing and for due cause shown have later revoked that order and directed a suspension, in lack of such assurance. § 3586; *Tagg Bros.* v. *United States,* 280 U. S. 420, 444, 50 Sup. Ct. 220.

The order of the commission of October 20, 1941, was in one aspect an attempt to revoke the "order" of August 14, 1939, which from a legal standpoint did not exist, and it was fatally defective in two respects: It in fact suspended the effective date of the schedule

filed by the company without giving it an opportunity to meet the condition necessary to the exercise of the power to make such an order, that is, the filing of assurance satisfactory to the commission of the ability and willingness of the company to refund any excess charges; and it directed the company to collect charges lower than those stated in the schedule without first having found that the rates fixed in it were unreasonably discriminatory or more than just, reasonable and adequate. As, however, the appeal of the company enabled it to continue to collect charges as stated in the schedule and the final order of the commission, the validity of which, as regards those rates, is not attacked, found the rates stated in the schedule to be proper, the company has suffered no injury by the order. The company collected no charges which it was not lawfully entitled to charge, and there is no obligation upon it to make a refund. The statute does not in terms give the commission the right to order a refund, and in view of our conclusion just stated we have no occasion to consider whether there is in its terms an implication of authority to do so. See *Public Utilities Commission* v. *Gas Co.*, 317 U. S. 456, 463, 63 Sup. Ct. 369; *Rockwell Lime Co.* v. *Commerce Commission*, 373 Ill. 309, 314, 26 N. E. (2d) 99.

The company has appended to its appeal a request for a declaratory judgment. Section 5334 authorizes the Superior Court to render such judgments "in any action or proceeding." Section 251(a) of the Practice Book, however, states: "The form and practice prescribed for civil actions shall be followed." This requires a writ and complaint in accordance with the requirements of §§ 5504-5506 of the General Statutes, served and returned as are writs in ordinary civil actions. The appeal taken by the city was a special statutory proceeding, not an ordinary civil action.

General Statutes, § 3608 et seq. The extent to which we will entertain a reservation rests in our discretion. *Greenwich Trust Co.* v. *Brixey*, 117 Conn. 663, 664, 166 Atl. 918. The request for a declaratory judgment was misjoined to the appeal and we do not consider any questions not involved in the determination of the appeals taken respectively by the company and the city. The questions propounded in the reservation, more than twenty in number and covering more than five pages of the printed record, are complicated by the inclusion of statements of fact and conclusions of law and fact some of which, appearing particularly in questions put forward by the city, are in themselves erroneous. We shall not attempt to give specific answers to the questions stated in the reservation, but, instead, we advise the Superior Court as follows: 1. The schedule of rates stated in the contract between the company and the city was superseded by those prescribed by the commission in 1931, and any subsequent changes in those rates were within the purview of and controlled by the provisions of § 1414c (d) and (e). 2. (a) The schedule of rates filed by the company with the commission on August 8, 1939, in the absence of any order by the commission, became effective on the date set in it, November 1, 1939. (b) While the commission could properly conduct an investigation and hold hearings upon its own initiative, the statute does not require it to hold them unless in its discretion it decides to do so or unless a written complaint is made to it by "the state, under direction of the governor." (c) There is no violation of any constitutional requirement in the fact that the rates would become effective without a hearing, in the absence of decision by the commission in its discretion to hold one, or of a written complaint. (d) If it decided to hold a hearing or one was required by the filing of a written

complaint, notice as specified in § 1414c (e) would be necessary. 3. The commission had no authority to make the "order" of August 14, 1939, in which it found "no occasion to suspend the effective date" of the schedule filed by the company, and the "order" was in legal contemplation a nullity. 4. The order of the commission on October 20, 1941, was erroneous in that it suspended in general the effectiveness of the schedule as of January 1, 1942, without affording the company an opportunity to file with it assurance satisfactory to it of the company's ability and willingness to refund to its customers any amounts collected in excess of the rates finally fixed by the commission, and in that it ordered the company as of January 1, 1942, to re-establish for the most part the rates in effect before November 1, 1939, without first finding that the rates in the schedule filed August 8, 1939, were unreasonably discriminatory or more than just, reasonable and adequate. 5. Under the supersedeas resulting from the appeal taken by the company from the order of October 20, 1941, it had the right to continue to collect rates under the schedule filed by it, subject at most to an obligation to make a refund to customers should those rates finally be found to be excessive. 6. The effect of the ultimate determination by the commission that those rates had not been and were not excessive within the terms of the statute was to free the company from any duty to make a refund to its customers.

No costs will be taxed in this court to either party.

In this opinion the other judges concurred.