BUSINESS AIDES, INC., a Virginia corporation, Appellant,

v.

The CHESAPEAKE AND POTOMAC TELEPHONE COMPANY OF VIRGINIA, a Virginia corporation, Appellee.

No. 72-1493.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 3, 1972.

Decided June 27, 1973.

& Lambiotte, Newport News, Va., on brief), for appellant.

Lewis T. Booker, Richmond, Va. (John H. Shenefield and Hunton, Williams, Gay & Gibson, Richmond, Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, BOREMAN, Senior Circuit Judge, and WIDENER, Circuit Judge.

BOREMAN, Senior Circuit Judge:

This is an appeal by Business Aides, Inc. (BAI) from a decision of the district court[1] granting a motion for summary judgment in favor of The Chesapeake and Potomac Telephone Company of Virginia (C & P), dismissing a private antitrust action brought by BAI against C & P. The issue before this court on appeal is whether the action of C & P in refusing the request of BAI's predecessor, Professional Answering Service, to supply certain equipment and services necessary to join two separate telephone exchanges so that a single office of BAI would be able to supply telephone answering services to residents of both exchanges, was protected from application of the antitrust laws under the "state action" doctrine derived from Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and its progeny.[2]

BAI operated a telephone answering service in the Williamsburg, Virginia, area under the name of Professional Answering Service (PAS) from January 1966 until November 1970, when it sold that portion of its operation. C & P provides the telephone service throughout its franchised area of Virginia and was in competition with PAS insofar as it supplied automatic telephone answering and recording devices for a fee.

In early 1967, PAS sought to expand its business from its then current operations in Williamsburg, into Denbigh,

Vincent F. Ewell, Jr., Newport News, Va. (Arthur G. Lambiotte and Ferguson

1. Business Aides, Inc. v. The Chesapeake and Potomac Telephone Company of Virginia, 339 F.Supp. 1391 (E.D.Va. 1972).

2. *E. g.*, Hecht v. Pro-football, Inc., 144 U.S.App.D.C. 56, 444 F.2d 931, 936–937 (1971); Ladue Local Lines v. Bi-State Development Agency, 433 F.2d 131, 134–135 (8 Cir. 1970).

Virginia, which was in the separate but contiguous exchange area of Newport News, Virginia. To facilitate this expansion, PAS requested C & P to make available "concentrator-identifier" equipment to enable it to furnish answering service to patrons within the dialing area[3] although in the separate exchanges, without incurring mileage charges. C & P refused to comply with the request and responded that "concentrator identifier is not a tariff offering of the Virginia Company and there are no plans to provide this service on a special assembly basis."

Subsequently, in October of 1967 PAS initiated an answering service in the Denbigh area through a separate branch office[4] in order to demonstrate the demand for the service in Denbigh and to illustrate its own need to join the exchanges for efficiency of operation. C & P continued to refuse to supply the requested equipment and services and this action for damages and injunctive relief from violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2, was brought pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C.A. §§ 15 and 26.

C & P's argument, adopted by the district court, is that its actions were governed solely by its tariffs, approved by the Virginia State Corporation Commission (SCC), and therefore constituted "state action" within the doctrine of Parker v. Brown, *supra.*

In *Parker,* the Supreme Court dealt with the California Agricultural Prorate Act under which was established a program for the purpose of artificially controlling the price of raisins by regulating the flow of raisins into the market. The program was established at the petition of the growers and was administered by industry members subject to affirmative approval of the state Agricultural Prorate Advisory Commission.

A three-judge district court found that the program violated the Sherman Act and issued an injunction prohibiting its enforcement against the plaintiff. In reversing the district court and dissolving the injunction, the Supreme Court assumed that the program would violate the antitrust laws if the product of private contract or combination, and held:

"But it is plain that the pro-rate program here was never intended to operate by force of individual agreement or combination. It derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command. We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. . . .

"The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action *or official action directed by a state.*" 317 U.S. at 350–351, 63 S.Ct. at 313 (emphasis added).

■■ C & P is not a state agency and, therefore, the scope of its tariffs must be carefully analyzed in order to determine whether it acted pursuant to the direction of the state in refusing to provide the requested services. If its actions were occasioned by adherence to the rules and regulations of its operative tariff, then it is shielded from liability for any possible antitrust violations:

"Our view is that the *Parker* exclusion applies to the rates and practices of public utilities enjoying monopoly status under state policy when their rates and practices are subjected to meaningful regulation and supervision by the state to the end that they are the result of the considered judgment

---

3. Although the Williamsburg and Newport News areas were separate exchanges, free local service between the areas was provided to business and residential phone subscribers.

4. This branch was sold separately from the Williamsburg office in February of 1970.

of the state regulatory authority; . . . ." Gas Light Co. of Columbus v̇. Georgia Power Co., 440 F.2d 1135, 1140 (5 Cir. 1971).

*Accord*, Lamb Enterprises v. Toledo Blade Co., 461 F.2d 506, 513 (6 Cir. 1972); Allstate Insurance Co. v. Lanier, 361 F.2d 870, 872 (4 Cir. 1966); Fleming v. Travelers Indemnity Co., 324 F. Supp. 1404, 1407 (D.Mass.1971).

The tariff [5] regulating C & P's activities in supplying service to telephone answering bureaus was approved by the SCC [6] on June 30, 1959, as "reasonable and just" after a public hearing at which the interests of the telephone answering industry were represented by a number of bureaus and their counsel. That tariff provides in part:

"2. Answering Connections are provided by such facilities as are deemed appropriate by the Company and may make use of concentrator-identifier equipment.

. . . . . .

"5. . . . The rates set forth in this tariff contemplate that a Bureau and its patrons will be located in the same exchange and that only one termination per line will be provided."

It is the contention of BAI that the use of discretionary language in section 2 of the tariff ("facilities as are deemed appropriate by the Company") destroys the effectiveness of the tariff as a shield against application of the antitrust laws because of the limitation on the *Parker* doctrine that "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring their action is lawful." Parker v. Brown, *supra*, 317 at 351, 63 S.Ct. at 314. *Accord*, Norman's on the Waterfront v. Wheatley, 444 F.2d 1011, 1016–1018 (3 Cir. 1971); Woods Exploration v. Aluminum Co. of America, 438 F.2d 1286, 1294 (5 Cir. 1971); Asheville Tobacco Bd. of Trade v. FTC, 263 F.2d 502, 508–510 (4 Cir. 1959). However, no authority is given C & P to refuse service to any bureau requesting it; on the contrary, both statute [7] and tariff [8] direct C & P to supply authorized service anywhere along its lines as requested. Section 2 of the pertinent tariff merely leaves to the expertise of C & P the determination of the most reasonable method of fulfilling those requests. Any other resolution of the problem would have put the SCC in the untenable position of having to make individual rulings on the type of equipment and service to be furnished to each potential customer. The Virginia Constitution and Code provide an adequate remedy to any bureau which feels it has not received authorized service. The bureau may seek relief by complaint to the SCC,[9] which has an affirmative duty to maintain active control over the practices of Virginia transmission companies,[10] with an appeal as of right

5. SCC–Va. No. 1, Section 24–A; "Service for Telephone Answering Bureaus."

6. This court held in Washington Gas Light Co. v. Virginia Electric & Power Co., 438 F.2d 248, 251 (4 Cir. 1971), that the Virginia SCC qualifies as a proper state agency for purposes of providing *Parker*-type immunity for actions taken pursuant to its regulations.

7. Va. Code Ann. § 56–234 (1969):
It shall be the duty of every public utility to furnish reasonably adequate service and facilities at reasonable and just rates to any person, firm or corporation along its lines desiring same.
. . . .

8. General Exchange Tariff, n. 5, *supra*:
1) Service and equipment for telephone answering purposes *is* furnished to an individual, firm or corporation, termed the Bureau, which has arranged to answer incoming calls for ten or more telephone customers who are its patrons. [Emphasis added.]

9. Va.Code Ann. §§ 56–6, 56–247, 56–478 (1969).

10. Va.Const. Art. IX, § 2 (1973 replacement); Va.Code Ann. §§ 56–35, 56–479 (1969).

directly to the Virginia Supreme Court from an adverse decision of the SCC.[11]

The section of the tariff which relates with greater pertinency to the matter here in controversy is that which provides:

> "5. . . . The rates set forth in this tariff contemplate that a Bureau and its patrons will be located in the same exchange. . . ."

BAI interprets this clause as permitting the joinder of exchanges because it does not specifically prohibit such an action, thereby placing C & P in violation of its duties to supply service and consequently outside the protection afforded "state action" by the *Parker* doctrine. *See,* Alabama Power Co. v. Alabama Electric Cooperative, 394 F.2d 672, 675 (5 Cir. 1968). C & P maintains that it is without authority to join exchanges in the face of the above provision.

Unlike public service corporations of Virginia which, in general, may promulgate new regulations which take effect unless suspended by the SCC,[12] telephone companies may not utilize "company-made" rates and regulations. Board of Supervisors of Fairfax County v. Chesapeake and Potomac Telephone Co., 212 Va. 57, 182 S.E.2d 30, 32–34 (1971). Instead, C & P must submit its proposals to the SCC for a public hearing and affirmative approval before any alteration in its practices may be made. The distinction is founded upon Va.Code Ann. § 56–478 which deals specifically with telephone companies and provides in part:

> "All rates, charges, rules and regulations adopted or acted upon by any [telephone] company in conflict with those prescribed by the Commission within the scope of its authority shall be unlawful and void."

Therefore, had C & P joined the exchanges upon the request of PAS without first seeking and receiving approval by the SCC,[13] it would have exposed itself to possible sanctions imposed by the SCC under Va.Code Ann. § 56–483 for violation of its rules and regulations. The SCC was equally available to PAS in seeking to obtain a change in the operative tariff governing telephone answering bureaus. Under the circumstances of the instant case we conclude that this public utility is not required to seek revision of its tariff for the convenience of a customer. In attempting to alleviate the effects of the undesired provision of a lawful tariff of C & P the burden is on the bureau seeking the change or on the SCC itself under its constitutional and statutory duties. This court stated in an earlier opinion dealing with a comprehensively regulated utility under the control of the Virginia State Corporation Commission:

> "The antitrust laws are a poor substitute, we think, for plaintiff's failure to promptly protest to the SCC and to seek the administrative remedy ultimately shown to have been available and effective. We think VEPCO's promotional practices were at all times within the ambit of regulation and under the control of SCC, and we hold these practices exempt from the application of the laws of antitrust under the *Parker* doctrine." Washington Gas Light Co. v. Virginia Electric & Power Co., 438 F.2d 248, 252 (4 Cir. 1971).

We hold that C & P acted here at all times within the ambit of the operative tariff governing its services to telephone answering bureaus. Accordingly, we affirm the judgment of the district court.

Affirmed.

---

11. Va.Const. Art. IX, § 4 (1973 replacement); Va.Code Ann. §§ 56–6, 56–239 (1969).

12. Va.Code Ann. § 56–240 (1969).

13. Pursuant to Va.Code Ann. § 56–237 (1969).