ALAN MAZZOLA *v.* THE SOUTHERN NEW ENGLAND TELEPHONE COMPANY

HOUSE, C. J., COTTER, MACDONALD, LONGO and SPEZIALE, Js.

Argued May 7—decision released August 19, 1975

*Arthur P. Meisler,* for the appellant (plaintiff).

*Milton L. Jacobson,* with whom were *Jackson T. King, Jr., James B. Curtin,* and *Judith A. Maynes,* for the appellee (defendant).

*Robert M. Langer,* assistant attorney general, with whom, on the brief, was *Carl R. Ajello,* attorney general, as amicus curiae.

COTTER, J. The plaintiff brought an action in the Superior Court seeking (1) injunctive relief, under § 35-34 of the General Statutes, against the defendant's continuing termination and interruption of his telephone service, and (2) money damages and attorney's fees and costs, under § 35-35 of the General Statutes, all as provided for in the Connecticut Anti-Trust Act, hereinafter referred to as the act. General Statutes §§ 35-24 to 35-44. The complaint alleges, inter alia, that the defendant's practices in enforcing certain specified policies were "unlawful as they are for the purpose or have the effect of: (a) Fixing, controlling or maintaining prices, rates or quotations; (b) Refusing to deal or coercing, persuading or inducing third parties to refuse to deal with another person." The Superior Court, however, refused to assume jurisdiction over the matters complained of and the plaintiff appealed.

The proceedings on appeal as followed by the parties raise only the question of the jurisdiction of the trial court to adjudicate the plaintiff's complaint, a question which can be determined on the

present state of the record. *Lusas* v. *St. Patrick's Roman Catholic Church Corporation,* 123 Conn. 166, 168, 193 A. 204. We express our opinion upon those issues briefed and argued by the parties since they concern so fundamental an issue as "the right of the trial court to proceed with the case." *Lusas* v. *St. Patrick's Roman Catholic Church Corporation,* supra, 167–68; *Eder* v. *Patterson,* 132 Conn. 152, 155, 42 A.2d 794; see also *In re Application of Title & Guaranty Co.,* 109 Conn. 45, 51–52, 145 A. 151; *Storm Bros.* v. *Balcones Heights,* 239 S.W.2d 842, 845–46 (Tex. Civ. App.); Maltbie, Conn. App. Proc. § 10 n.22; and see *Long* v. *Zoning Commission,* 133 Conn. 248, 249, 50 A.2d 172.

## I

Since the court declined to rule on the merits of the plaintiff's complaint, we need only determine whether its conclusion that it did "not have jurisdiction with this matter" was erroneous. It appears that the court based this conclusion upon two alternative theories: (1) that the public utilities commission (hereinafter the PUC) had "primary" jurisdiction of the matters complained of; or (2) that the activities of the defendant challenged by the plaintiff were "immune" from antitrust liability. We consider whether either of these theories, which are interrelated in antitrust cases involving a regulated industry, is a proper basis for the trial court's decision as presented to us and as briefed by the parties and the amicus curiae.

Enacted in 1971,[1] the act incorporates, in modified form, and with notable exceptions, various provisions of such federal antitrust laws as, for

---

[1] Public Acts 1971, No. 608 (as amended).

example, the Sherman Act,[2] the Clayton Act,[3] the Antitrust Civil Process Act,[4] and of such state antitrust laws as the provisions embodied in the proposed Uniform State Antitrust Act.[5]   See 14 H.R. Proc., 1971 Sess., pt. 9, p. 4182 (remarks of Rep. David H. Neiditz); see also Brodigan, "The Connecticut Antitrust Act," 47 Conn. B.J. 12, 16–17, 19, for a discussion of the statutory sources of the Connecticut provisions.   The act repealed the previous state antitrust statute, General Statutes § 53-310, which was originally enacted in 1911 as "An Act Concerning Combinations to Increase Prices of Necessities."[6]   During the approximately sixty years of its existence, no actions are reported to have been instituted under that act.   Under these circumstances, reference to opinions of courts in other jurisdictions, federal and state, on pertinent antitrust law issues, where appropriate, are an aid to our interpretation of certain questions arising under the present Connecticut statute.

II

The doctrine of primary jurisdiction is a rule of judicial administration created by court decision in order to promote "proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States* v. *Western Pacific R. Co.,* 352 U.S. 59, 63, 77 S. Ct. 161, 1 L. Ed. 2d 126.   Its basis is the concept that courts and administrative agencies are, as Justice Frankfurter suggested, "collaborative instrumentalities of justice." *United States* v. *Morgan,* 313 U.S. 409, 422, 61 S. Ct. 999, 85 L. Ed. 1429.

---

[2] 26 Stat. 209, 15 U.S.C. § 1.

[3] 38 Stat. 731, 15 U.S.C. § 14.

[4] 76 Stat. 548, 15 U.S.C. § 1312.

[5] 4 C.C.H. Trade Reg. Rep. ¶ 30,101.

[6] Public Acts 1911, c. 185.

## A

A premise upon which the primary jurisdiction doctrine is invoked is that the court itself has original "subject matter" jurisdiction of the questions raised in the complaint filed in that court. " 'Primary jurisdiction' . . . applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *United States* v. *Western Pacific R. Co.*, supra, 64. The doctrine is thus distinguished from the concept of exclusive agency jurisdiction, which refers to matters which an agency alone has the power to adjudicate and of which the court has no jurisdiction. *Terminal Warehouse Co.* v. *Pennsylvania R. Co.*, 297 U.S. 500, 514, 56 S. Ct. 546, 80 L. Ed. 827; see also *Hughes Tool Co.* v. *Trans World Airlines*, 409 U.S. 363, 93 S. Ct. 647, 34 L. Ed. 2d 577, reh. denied, 410 U.S. 975, 93 S. Ct. 1434, 35 L. Ed. 2d 707. Similarly, a court may not refer a controversy within its jurisdiction to an agency under this doctrine where the agency itself lacks jurisdiction; the court's jurisdiction in such cases is exclusive. *Collens* v. *New Canaan Water Co.*, 155 Conn. 477, 480–81, 234 A.2d 825; 73 C.J.S., Public Administrative Bodies and Procedure, § 40.

In addition, the primary jurisdiction doctrine is distinguishable from the concept of "exhaustion of administrative remedies." The latter requires a party to exhaust such remedies before seeking judicial relief and "contemplates the situation in which

the claim is initially enforceable *exclusively* by administrative action." (Emphasis added.) Mitchell, "Primary Jurisdiction—What It Is and What It Is Not," 13 Proceedings A.B.A. Section of Antitrust Law 26, 29; see, e.g., *New Haven Water Co.* v. *Mauro Construction Co.*, 144 Conn. 195, 199, 128 A.2d 531; *Levitt* v. *Public Utilities Commission*, 114 Conn. 628, 634, 159 A. 878; 73 C.J.S., Public Administrative Bodies and Procedure, § 40.

B

Within the context of antitrust law enforcement, it has been stated that all that the doctrine of primary jurisdiction is designed to do, "and all that it properly does is to assure that the substantive exemptions from the antitrust laws created by . . . [the legislature] or required by the logic and structure of the regulatory scheme are not destroyed through by-passing the forum chiefly concerned with the regulation of the industry in question." Von Mehren, "The Antitrust Laws and Regulated Industries: The Doctrine of Primary Jurisdiction," 67 Harv. L. Rev. 929, 932. However, the mere existence of a "special regulatory scheme for particular aspects of an industry" does not, without more, "render the more general provisions of the antitrust laws wholly inapplicable to that industry," so that the court need not stay its hand[7] on an antitrust controversy and await action by the agency involved simply because the defendant in an anti-

---

[7] In the occasional cases where a court having original jurisdiction of the subject matter stays or dismisses the proceedings and refers the controversy, or some portion thereof, to the agency to exercise jurisdiction deemed to be "primary," "[c]ourt jurisdiction is not thereby ousted, but only postponed." *United States* v. *Philadelphia National Bank*, 374 U.S. 321, 353, 83 S. Ct. 1715, 10 L. Ed. 2d 915; *Carnation Co.* v. *Pacific Westbound Conference*, 383 U.S. 213, 223, 86 S. Ct. 781, 15 L. Ed. 2d 709.

trust suit is subject to regulation by a public administrative body. *Carnation Co.* v. *Pacific Westbound Conference,* 383 U.S. 213, 218, 86 S. Ct. 781, 15 L. Ed. 2d 709; see also *Otter Tail Power Co.* v. *United States,* 410 U.S. 366, 373, 93 S. Ct. 1022, 35 L. Ed. 2d 359, reh. denied, 411 U.S. 910, 93 S. Ct. 1523, 36 L. Ed. 2d 201; *Cascade Natural Gas Corporation* v. *El Paso Natural Gas Co.,* 386 U.S. 129, 131, 87 S. Ct. 932, 17 L. Ed. 2d 814; *Georgia* v. *Pennsylvania R. Co.,* 324 U.S. 439, 456–57, 65 S. Ct. 716, 89 L. Ed. 1051; *Alabama Power Co.* v. *Alabama Electric Cooperative, Inc.,* 394 F.2d 672, 681–82 (5th Cir.) (opinion of Godbold, J., dissenting); *Carter* v. *American Telephone & Telegraph Co.,* 365 F.2d 486, 496–97 (5th Cir.); *United States Telephone Co.* v. *Central Union Telephone Co.,* 202 F. 66, 71 (6th Cir.), cert. denied, 229 U.S. 620, 33 S. Ct. 1049, 57 L. Ed. 1354; Hale & Hale, "The Otter Tail Power Case: Regulation by Commission or Antitrust Laws," 1973 Sup. Ct. Rev. 99, 100–102. Rather, "[a]ctivities which come under the jurisdiction of a regulatory agency nevertheless may be subject to scrutiny under the antitrust laws." *Otter Tail Power Co.* v. *United States,* supra, 372. Thus, the rule is that a court should generally refer an anti-. trust controversy to an appropriate agency in cases where action thereon by that agency will result in a determination of the defendant's liability under the antitrust laws.[8] *Carnation Co.* v. *Pacific West-*

---

[8] For example, where the activities challenged by the plaintiff are "arguably lawful" within the meaning of applicable terms in the agency statute, or arguably have been approved as lawful by the agency. *Ricci* v. *Chicago Mercantile Exchange,* 409 U.S. 289, 362, 93 S. Ct. 573, 34 L. Ed. 2d 525, reh. denied, 410 U.S. 960, 93 S. Ct. 1411, 35 L. Ed. 2d 697; *Carnation Co.* v. *Pacific Westbound Conference,* 383 U.S. 213, 221–22, 86 S. Ct. 781, 15 L. Ed. 2d 709; King, "The 'Arguably Lawful' Test of Primary Jurisdiction in Antitrust Litigation Involving Regulated Industries," 40 Tenn. L. Rev. 617,

*bound Conference,* supra, 221–22, citing *United States Navigation Co.* v. *Cunard Steamship Co.,* 284 U.S. 474, 52 S. Ct. 247, 76 L. Ed. 408, and *Far East Conference* v. *United States,* 342 U.S. 570, 72 S. Ct. 492, 96 L. Ed. 576; *California* v. *Federal Power Commission,* 369 U.S. 482, 485–86, 488–89, 82 S. Ct. 901, 8 L. Ed. 2d 54; see also *Federal Maritime Board* v. *Isbrandtsen Co.,* 356 U.S. 481, 497–98, 78 S. Ct. 851, 2 L. Ed. 2d 926; Jaffe, Judicial Control of Administrative Action, p. 147; Miron, "Primary Jurisdiction," 43 A.B.A. Antitrust L.J. 329, 333. It has been pointed out that an agency may also have primary jurisdiction of an antitrust controversy even when it lacks the express or implied power to exempt the activities challenged from antitrust liability where the agency is in an advantageous position to be of "material assistance" to the court by marshalling a crucial fact or facts, potentially determinative of the antitrust lawsuit, into a "meaningful pattern"; *Chicago Mercantile Exchange* v. *Deaktor,* 414 U.S. 113, 114–15, 94 S. Ct. 466, 38 L. Ed. 2d 344; *Federal Maritime Board* v. *Isbrandtsen Co.,* supra, 498; and a procedure exists empowering the antitrust plaintiff to raise the issue before the agency. *Ricci* v. *Chicago Mercantile Exchange,* 409 U.S. 289, 304–305 n.14, 93 S. Ct. 573, 34 L. Ed. 2d 525, reh. denied, 410 U.S. 960, 93 S. Ct. 1411, 35 L. Ed. 2d 697.[9]

624–31. It has been said that, in order to conserve judicial time and energy, deferral to the agency in such cases should depend on whether a determination by the agency of the "lawfulness" of the activities will be treated by the court as decisive. King, loc. cit.; Kestenbaum, "Primary Jurisdiction to Decide Antitrust Jurisdiction: A Practical Approach to the Allocation of Functions," 55 Geo. L.J. 812.

[9] The agency's findings of fact are generally subject to judicial review on direct appeal, where appropriate statutory provisions permit. See, e.g., *Carter* v. *American Telephone & Telegraph Co.,*

## III

In this case, the complaint filed in the Superior Court alleged that the plaintiff is a subscriber to the telephone service provided by the defendant (a "public service company" as defined by General Statutes § 16-1[10] and subject to the applicable provisions of the Public Service Companies Act, General Statutes § 16-1 et seq.). In connection with its telephone service, the complaint alleged, the defendant leases telephone answering and message taking devices which, if leased from the defendant, require no further coupler, interface, or similar protective link apparatus when attached to the subscriber's telephone. If the devices are obtained from some source other than the defendant, however, the defendant requires the subscriber to lease the protective link apparatus from the defendant at a monthly charge fixed by the defendant.

The complaint further alleged that the defendant requires the subscriber to lease this protective link apparatus even if the answering devices obtained privately do not damage the defendant's property or interfere with its service. The plaintiff claimed that he obtained from a private supplier a telephone answering and message taking device; upon his refusal to comply with the defendant's demand that he lease a coupler, interface, or protective link to

---

365 F.2d 486, 493 n.12 (5th Cir.). Its findings of fact would not subsequently be subject to collateral attack in the antitrust suit. *Port of Boston Marine Terminal Assn.* v. *Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 71–72, 91 S. Ct. 203, 27 L. Ed. 2d 203.

[10] "[General Statutes] Sec. 16-1. DEFINITIONS. Terms used in this title shall be construed as follows, unless another meaning is expressed or is clearly apparent from the language or context: . . . 'public service company' includes . . . telephone . . . companies . . . ."

be installed between his device and the defendant's other telephone equipment, the defendant terminated his telephone service. The trial court observed that the procedure followed by the defendant was in accord with its present tariff as approved by the PUC on January 1, 1969.

On the basis of these allegations, the plaintiff claimed that the defendant's cited practices constituted "price-fixing" and "refusals to deal" of the kind prohibited by the act, which makes unlawful "every contract, combination, or conspiracy" when such are "for the purpose, or have the effect, of: (a) Fixing, controlling, or maintaining prices, rates, quotations, or fees in any part of trade or commerce; (b) fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, mining, sale, or supply of any part of trade or commerce; (c) allocating or dividing customers or markets, either functional or geographical, in any part of trade or commerce; or (d) refusing to deal, or coercing, persuading, or inducing third parties to refuse to deal with another person." General Statutes § 35-28. Jurisdiction to adjudicate claimed violations of this statute is vested in the Superior Court by § 35-33.[11] See *Macom Products Corporation* v. *American Telephone & Telegraph Co.*, 359 F. Sup. 973, 975, 978 (C.D. Cal.). The action brought by the plaintiff was thus "of the general class [of cases] to which the proceedings in question belong[ed]" as required for the trial

[11] "[General Statutes] Sec. 35-33. SUPERIOR COURT JURISDICTION. The superior court of this state is hereby vested with jurisdiction to prevent and enjoin violations of this part. Any action or proceeding brought by the state, or any private party, for violation of the provisions of this part shall be brought in the superior court of the county where the offense, or any part thereof, is committed, or in any county where any of the alleged offenders reside or are

court to be deemed to have had original jurisdiction of the subject matter involved. *Reed* v. *Reincke,* 155 Conn. 591, 598, 236 A.2d 909.

## A

The act "applies to every contract, combination, or conspiracy in restraint of any part of trade or commerce or every contract, combination or conspiracy to monopolize, or every attempt to monopolize, or every monopolization of any part of trade or commerce when any part thereof was entered into or effectuated in whole or in part in this state." General Statutes § 35-30. The Public Service Companies Act, as amended, does not expressly confer on the PUC the power to exempt activities of the defendant, such as those challenged by the plaintiff, from the reach of the act.[12]

Nonetheless, the act itself contains four classes of express "exceptions" from liability under the act. General Statutes § 35-31. Such exceptions are to be strictly construed. *United States* v. *McKesson & Robbins,* 351 U.S. 305, 316, 76 S. Ct. 937, 100 L. Ed.

---

found, or any agent resides or is found, or where any proprietor, association, firm, partnership, or corporate defendant does business."

Since the statute specifically empowered the plaintiff to seek relief from the alleged violations of the act initially in Superior Court, the doctrine of "exhaustion of administrative remedies" did not apply. Mitchell, "Primary Jurisdiction—What It Is and What It Is Not," 13 Proceedings A.B.A. Section of Antitrust Law 26, 29; 73 C.J.S., Public Administrative Bodies and Procedure, § 40; see discussion, supra, section II, part A.

[12] Compare Federal Communications Commission Act, § 221 (a), 47 U.S.C. § 221 (a), which in its provision relating to mergers of companies subject to supervision under it, states: "If the Commission finds that the proposed consolidation, acquisition, or control will be of advantage to the persons to whom service is to be rendered and in the public interest, it shall certify to that effect; and thereupon any Act or Acts of Congress making the proposed transaction unlawful shall not apply."

1209; *United States* v. *Borden Co.*, 308 U.S. 188, 196–202, 60 S. Ct. 182, 84 L. Ed. 181. The exception pertinent to the facts of this case states that "nothing contained in this part shall apply to those activities of any person when said activity is *specifically directed or required* by a statute of this state, or of the United States [emphasis added]." § 35-31 (b). General Statutes § 16-19[13] outlines the procedure before the PUC whereby a tariff proposed by a telephone company authorizing

[13] "[General Statutes] Sec. 16-19. AMENDMENT OF RATE SCHEDULE; INVESTIGATION AND FINDINGS BY COMMISSION; HEARINGS; DEFERRAL OF MUNICIPAL RATE INCREASES; REFUNDS. Each public service company shall file any proposed amendment of its existing rate schedule with the commission in such form and in accordance with such reasonable regulations as the commission may prescribe. The commission, if in its opinion such action appears necessary or suitable in the public interest, may, and, upon written petition or complaint of the state, under direction of the governor, shall, make such investigation of such schedule of rates or proposed amendment as, in the opinion of the commission, is necessary to determine whether the rates specified in any schedule are unreasonably discriminatory or more or less than just, reasonable and adequate, or that the service furnished by such company is inadequate to or in excess of public necessity and convenience, and shall, in the case of a proposed amendment increasing the rate schedule of a gas or electric company, make such investigation and hold at least one public hearing thereon, provided the commission may approve without public hearing an interim rate increase under bond and subject to refund with interest if the rate approved after hearing is less than the interim rate and provided further the commission may, in its discretion, hold such hearing or hearings upon any increase in the rates charged by a gas or electric company resulting from the application of a fuel cost adjustment or purchased gas adjustment clause pursuant to section 16-19b. If the commission finds any rate to be unreasonably discriminatory or more or less than just, reasonable and adequate to enable such company to provide properly for the public convenience, necessity and welfare, or the service to be inadequate or excessive, it may determine and prescribe an adequate service to be furnished and just and reasonable maximum rates and charges to be made by such company. The commission may, in its discretion, pending its conclusion upon an amendment increasing any rate, suspend the effective date of such increase for not more than one

activities such as those complained of in this case becomes effective. *New Haven* v. *New Haven Water Co.*, 132 Conn. 496, 509, 45 A.2d 831. Thus, the question pertinent to the issue of the trial court's jurisdiction of the action below, raised by the interplay of §§ 35-31 (b) and 16-19, was whether the activities of a telephone company such as the defendant, authorized by a tariff which becomes effective through the implementation of the procedure described in § 16-19, can be characterized as "specif-

---

hundred and fifty days from the effective date of such increase. If the commission has not made its finding respecting such increase within the period of suspension, such increase may become effective pending the commission's finding with respect to such increase or, in the discretion of the commission, any amendment increasing any rate may become effective upon the filing by the company with the commission of assurance satisfactory to the commission, which may include a bond with surety, of the company's ability and willingness to refund to its customers such amounts as the company may collect from them in excess of the rates fixed by the commission in its finding or fixed at the conclusion of any appeal taken as a result of a finding by the commission. If the commission finds that the imposition of any increase in rates would create a hardship for a municipality, because such increase is not reflected in its then current budget, or cannot be included in the budget of its fiscal year which begins less than five months after the effective date of such increase, the commission may defer the applicability of such increase with respect to services furnished to such municipality until the fiscal year of such municipality beginning not less than five months following the effective date of such increase; provided the revenues lost to the public service company through such deferral shall be paid to the public service company by the municipality in its first fiscal year following the period of such deferral. Upon conclusion of its investigation of the reasonableness of such increase, the commission may order the company to refund to its customers any amounts the company may have collected from them during the period that such increase was in force, which amounts the commission may find to have been in excess of the rates fixed by the commission in its finding or fixed at the conclusion of any appeal taken as a result of a finding by the commission. Any such refund ordered by the commission shall be paid by the company, under direction of the commission, to the customer in such amounts as are determined by the commission."

ically directed or required" by that statute[14] so as to be immune from antitrust liability under § 35-31 (b). King, "The 'Arguably Lawful' Test of Primary Jurisdiction in Antitrust Litigation Involving Regulated Industries," 40 Tenn. L. Rev. 617, 630–31. If so, the court would have been justified in staying its hand to allow the PUC to exercise its primary jurisdiction to determine whether the particular activities challenged by the plaintiff were indeed authorized by the tariff approved on January 1, 1969, and thus excepted from attack under the act by § 35-31 (b). See *California* v. *Federal Power Commission*, 369 U.S. 482, 485–86, 488–89, 82 S. Ct. 901, 8 L. Ed. 2d 54; *Carnation Co.* v. *Pacific Westbound Conference*, 383 U.S. 213, 221–22, 86 S. Ct. 781, 15 L. Ed. 2d 709; *Otter Tail Power Co.* v. *United States*, 410 U.S. 366, 93 S. Ct. 1022, 35 L. Ed. 2d 359; King, op. cit.

---

[14] No federal statutory provision on point has been briefed or argued. In 1968, however, the federal communications commission in its *Carterfone* decision declared void tariffs filed with the FCC and with state regulatory commissions by all domestic telephone companies prohibiting the interconnection of subscriber-owned devices with the carrier's telephone system. *In re Carterfone*, 13 F.C.C.2d 420, 424–26. Forthwith the regulated telephone companies filed tariffs (similar to that of the defendant in this case) with the appropriate regulatory agencies providing for interconnection of such equipment so long as the telephone company furnished, installed and maintained the interconnect. *International Telephone & Telegraph Corporation* v. *General Telephone & Electronics Corporation*, 351 F. Sup. 1153, 1179 (D. Hawaii), rev'd, 518 F.2d 913 (9th Cir.). The National Academy of Sciences has since reported to the FCC that its study of the technical factors affecting interconnection suggests that while the use of telephone company provided protection apparatus may have been temporarily expedient, there should ultimately be an equipment certification program conducted by the FCC. Id., 1179 n.59. In the meantime, courts have proceeded to adjudicate on the merits the validity of such apparatus requirements under federal antitrust laws. See, e.g., *International Telephone & Telegraph Corporation* v. *General Telephone & Electronics Corporation*, supra.

Section 35-31 (b) of our General Statutes has no parallel in the federal antitrust statutes.[15] Furthermore, in enacting this provision the Connecticut legislature also did not choose to follow the example set by several other states of specifically and unqualifiedly exempting from antitrust liability the activities of industries and other organizations subject to the supervision of the state regulatory agency equivalent to our public utilities commission.[16] Rather, the exception authorized by § 35-31 (b) represents a narrowly drawn version of the doctrine of "state action" immunity from antitrust liability articulated by the United States Supreme Court in *Parker* v. *Brown,* 317 U.S. 341, 350–51, 63 S. Ct. 307, 87 L. Ed. 315. The court in that case carved out an exemption from Sherman Act liability for activities "commanded" or "directed" by a state legislature. Ibid. Section 35-31 (b) limits that holding by purporting to immunize only activities which are "specifically" required or directed by state or federal statutes.

1

The immunity recognized in *Parker,* supra, related to a program expressly authorized under the California Agricultural Prorate Act. The plaintiff there, unlike the plaintiff in this case, did not allege particular violations of the antitrust laws by a regulated private company but claimed, rather, that the entire state regulatory scheme itself was

---

[15] In contrast, two other exceptions provided in § 35-31 have federal statutory equivalents: § 35-31 (a) is modeled after § 6 of the Clayton Act, 15 U.S.C. § 17; and § 35-31 (d) parallels § 1 of the Capper-Volstead Act, 7 U.S.C. § 291 et seq.

[16] See, e.g., Ariz. Rev. Stat. Ann. § 40-286; Cal. Pub. Util. Code § 8107; Ill. Rev. Stat., c. 38, § 60-5 (3); Md. Ann. Code, art. 83, § 39 (3); N.J. Stat. Ann. § 56:9-5 (3).

unlawful. Id., 348-49. The Prorate Act called for the establishment, "through action of state officials," of programs for the marketing of state farm products, so as to restrict competition among the growers and maintain prices in the distribution of their commodities to packers. Id., 346. That act further called for "the creation of an Agricultural Prorate Advisory Commission of nine members, of which a state official, the Director of Agriculture, is ex-officio a member." Ibid. This director, with the commission's approval, was then "required to select a program committee from among nominees chosen by the qualified producers." Ibid. This committee itself was required to formulate a proration marketing program for the commodity produced, which the commission was authorized to approve "after a public hearing" and a "finding that the program is reasonably calculated to carry out the objectives of the Act." Id., 347. Moreover, authority to administer the program was conferred by the Prorate Act upon the committee, and it was a misdemeanor, punishable by fine and imprisonment, "for any producer to sell or any handler to receive or possess without proper authority any commodity for which a proration program has been instituted." Ibid. The United States Supreme Court reversed a District Court decree enjoining enforcement of the program, noting that the Sherman Act was meant to prohibit "individual and not state action" and that, with respect to the prorate program, "it is the state, acting through the Commission, which adopts the program and which enforces it with penal sanctions, in the execution of a governmental policy." Id., p. 352.

Under the *Parker* rationale, the "threshold inquiry in determining if an anticompetitive activity is state action of the type the . . . [antitrust law] was not meant to proscribe is whether the activity is required by the State acting as sovereign." *Goldfarb* v. *Virginia State Bar,* 421 U.S. 773, 790, 95 S. Ct. 2004, 44 L. Ed. 2d 572; *Continental Ore Co.* v. *Union Carbide,* 370 U.S. 690, 706–709, 82 S. Ct. 1404, 8 L. Ed. 2d 777. The *Parker* doctrine draws a firm line, in short, between activities actually commanded by the state, which are immune from antitrust liability and action merely approved or tolerated. *Macom Products Corporation* v. *American Telephone & Telegraph Co.,* 359 F. Sup. 973, 976–77 (C.D. Cal.); 7 Von Kalinowski, "Antitrust Laws and Trade Regulations" § 46.03; Jacobs, "State Regulation and the Federal Antitrust Laws," 25 Case W. Res. L. Rev. 221, 241; note, *"Parker* v. *Brown*—Gone to Hecht: A New Test for State Action Exemptions," 24 Hastings L.J. 287, 305. As the *Parker* court itself declared, "a state does not give immunity to those who violate the . . . [antitrust laws] by authorizing them to violate [them], or by declaring that their action is lawful." *Parker* v. *Brown,* 317 U.S. 341, 351, 63 S. Ct. 307, 87 L. Ed. 315. A fortiori, actions or orders by state regulatory agencies merely to authorize or accept decisions previously made by private parties are not, without more, thereby immunized from antitrust attack under the *Parker* doctrine: "When such a sequence of events occurs, it is illogical for a regulated person to contend that he acted pursuant to governmental compulsion." Jacobs, op. cit., p. 242; see *Marnell* v. *United Parcel Service of America, Inc.,* 260 F. Sup. 391, 406–10 (N.D. Cal.). "It is not enough," the United States Supreme Court recently stated,

"that . . . anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be *compelled by direction of the State* acting as a sovereign." (Emphasis added.) *Goldfarb* v. *Virginia State Bar,* 421 U.S. 773, 791, 95 S. Ct. 2004, 44 L. Ed. 2d 572. Such is not the case when there is little or no agency insistence upon specific acts or policies, as in the case of practices or rates which originate with the regulated industry and are simply approved by the agency. *Macom Products Corporation* v. *American Telephone & Telegraph Co.,* supra, 976–77; *Marnell* v. *United Parcel Service of America, Inc.,* supra, 409; Jacobs, op. cit., pp. 242–43; note, 24 Hastings L.J., op. cit., p. 305; see also comment, *"Whitten* v. *Paddock*: The Sherman Act and the 'Government Action' Immunity Reconsidered," 71 Colum. L. Rev. 140, 142–48. "A reasonable limitation on . . . [the principle of state action immunity], then, requires that the state regulation be instituted by public officials and that it embody safeguards demonstrably protective of the public interest." Teply, "Antitrust Immunity of State and Local Governmental Action," 48 Tul. L. Rev. 272, 289. Significantly, one court has specifically held that the mere filing and approval of a tariff with a state regulatory commission, requiring that all telephone network control signaling be performed by equipment installed and maintained by the telephone company subject to regulation, does not constitute "state action" immune from antitrust liability under the *Parker* rationale. *Macom Products Corporation* v. *American Telephone & Telegraph Co.,* supra, 976; see also *Chastain* v. *American Telephone & Telegraph Co.,* 351 F. Sup.

1320, 1323 (D. D.C.); contra, *Business Aides, Inc.* v. *Chesapeake & Potomac Telephone Co. of Virginia,* 339 F. Sup. 1391, 1393 (E.D. Va.), aff'd, 480 F.2d 754 (4th Cir.).[17]

2

Under this analysis, the process provided in General Statutes § 16-19 whereby the PUC approves and thereby renders effective tariffs such as that proposed by the defendant in this case clearly does not amount to the kind of "state action" which invites application of the *Parker* doctrine. Section 16-19 requires the defendant to "file any proposed amendment of its existing rate schedule with the commission in such form and in accordance with such reasonable regulations as the commission may prescribe." None of the published regulations promulgated by the PUC applicable to the initial filing and approval of such tariffs, however, requires the defendant to submit with its proposal any facts specifically designed to make out a sufficient showing that the proposal is necessary, for example, to sat-

[17] The trial court relied extensively on the reasoning in *Business Aides*. The court in that case, however, had adopted the theory of "state action" immunity articulated in *Washington Gas Light Co.* v. *Virginia Electric & Power Co.,* 438 F.2d 248 (4th Cir.), which was also relied upon by both the trial court and the defendant in this case. The *Washington Gas Light* theory is that mere acquiescence by an agency in actions taken by companies subject to public regulation constitutes a grant of immunity under *Parker*. The validity of that theory was recently undermined by the United States Supreme Court in *Goldfarb* v. *Virginia State Bar*, 421 U.S. 773, 95 S. Ct. 2004, 44 L. Ed. 2d 572, a case reversing a Fourth Circuit Court of Appeals decision whose outcome had hinged on the *Washington Gas Light* theory. *Goldfarb* v. *Virginia State Bar*, 497 F.2d 1, 5 (4th Cir.). See also *Communication Brokers* v. *Chesapeake & Potomac Telephone Co. of Virginia,* 370 F. Sup. 967, 969 (W.D. Va.), where a district court in the Fourth Circuit declined to apply the *Parker* analysis of *Washington Gas Light* in a suit by a plaintiff engaged in the business of selling, leasing, installing, and repairing communication equipment, who alleged, inter alia, that the defendant tele-

isfy some public need. See, e.g., Regulations of Connecticut State Agencies § 16-1-45 et seq. and § 16-1-53 et seq. Furthermore, the PUC is ordinarily not under any obligation to conduct a fact-finding inquiry of its own "to determine whether the rates specified in any schedule are unreasonably discriminatory or more or less than just, reasonable and adequate, or that the service furnished by such company is inadequate to or in excess of public necessity and convenience"; such an investigation into a proposal submitted by the defendant is within the PUC's discretion.[18] Most strikingly, even if the PUC does conduct such an investigation and subsequently "finds any rate to be unreasonably discriminatory or more or less than just, reasonable

phone company had sought to restrain unduly competition by deliberately delaying the procurement of "interface devices" necessary for the interconnection of the plaintiff's equipment to the defendant's network. The theory underlying *Washington Gas Light,* also followed in *Gas Light Co. of Columbus* v. *Georgia Power Co.,* 440 F.2d 1135 (5th Cir.), cert. denied, 404 U.S. 1062, 92 S. Ct. 732, 30 L. Ed. 2d 750, reh. denied, 405 U.S. 969, 92 S. Ct. 1162, 31 L. Ed. 2d 244, has elsewhere been widely criticized. See, e.g., *Hecht* v. *Pro-Football, Inc.,* 444 F.2d 931, 937 n.17 (D.C. Cir.), cert. denied, 404 U.S. 1047, 92 S. Ct. 701, 30 L. Ed. 2d 736; *Norman's on the Waterfront, Inc.* v. *Wheatley,* 444 F.2d 1011, 1018 (3d Cir.); *George R. Whitten, Jr., Inc.* v. *Paddock Pool Builders, Inc.,* 424 F.2d 25, 30 (1st Cir.), cert. denied, 400 U.S. 850, 91 S. Ct. 54, 27 L. Ed. 2d 88; Jacobs, "State Regulation and the Federal Antitrust Laws," 25 Case W. Res. L. Rev. 221, 233-34; note, 85 Harv. L. Rev. 670, 673-74.

In this connection, it is likewise significant that the Connecticut act does not purport to immunize activities merely "approved" or "permitted" by regulatory agencies, a measure adopted in several other jurisdictions. See, e.g., Minn. Stat. § 325.8017.2; Va. Code of 1950 § 59.1-9.4 (b) (1974 Cum. Sup.); Wash. Rev. Code § 19.86.170.

[18] The investigation is, however, mandatory "upon written petition or complaint of the state, under direction of the governor." No claim or showing of such a petition or direction has been made in this case.

It is also well to note that different rules apply to investigations into proposals submitted by a gas or electric company under § 16-19 of the General Statutes.

and adequate to enable such company to provide properly for the public convenience, necessity and welfare, or the service to be inadequate or excessive," it is not actually required to disapprove of the proposal: the statute merely states that the PUC "may determine and prescribe an adequate service to be furnished and just and reasonable maximum rates and charges to be made by such company."[19] Significantly, this court on a previous occasion, construing predecessor provisions of the Public Service Companies Act, emphasized the uniquely discretionary nature of the PUC's threshold supervision over proposals filed by companies such as the defendant: "Our law, unlike the public utility laws in many jurisdictions, does not in general condition the establishment of a changed rate schedule by a utility company upon prior approval by the commission. All a company desiring to put into effect a changed rate schedule needs to do in the first instance is to file it with the commission. There is no obligation upon the company to apply to the commission for an order that the effective date of the schedule shall not be suspended, or upon the commission to make an order directing whether or not it shall be suspended, but, unless in the exercise of the power vested in it, expressly made discretionary, it does so order, the schedule becomes effective at the time fixed in it." *New Haven* v. *New Haven Water Co.,* 132 Conn. 496, 509–10, 45 A.2d 831.

Under these circumstances, the role that is statutorily assigned to the PUC in rendering effec-

[19] The term "may" in § 16-19 of the General Statutes is permissive and does not mean "shall," inasmuch as the word "shall" is used in an explicitly contrasting manner throughout the same provision. See *Shulman* v. *Zoning Board of Appeals,* 154 Conn. 426, 428–29, 226 A.2d 380.

tive tariffs proposed by companies such as the defendant amounts to little more than acquiescence in a program originated by the defendant.[20] In no sense, then, can activities of the defendant such as the kind of activities challenged by the plaintiff, purportedly authorized by a tariff filed with and approved by the PUC, be characterized as "compelled by direction of the State acting as a sovereign" under the *Parker* doctrine as it has been judicially interpreted. *Goldfarb* v. *Virginia State Bar,* 421 U.S. 773, 791, 95 S. Ct. 2004, 44 L. Ed. 2d 572. Nor can such activities consequently be comprehended within the more stringent standards applicable to exemptions from antitrust liability established by the act. General Statutes § 35-31 (b). Action on the controversy by the PUC under § 16-19, accordingly, would not have resulted in a determination of the defendant's liability under § 35-31 (b): a decision by the PUC that the particular activities challenged by the plaintiff were among the activities authorized by the defendant's tariff approved on January 1, 1969, would not necessarily mean that those activities were "specifically directed or required" by state statute. The PUC, then, cannot be said to have had express power to exempt the defendant's activities from antitrust liability so as to warrant a conclusion that it had primary jurisdiction over the matters complained of by the plaintiff. *California* v. *Federal Power Commission,* 369 U.S. 482, 485–89, 82

---

[20] Procedures are available under the Public Service Companies Act whereby the continuing validity of rates and services of a regulated telephone company may be adjudicated by the PUC. See, e.g., General Statutes §§ 16-9, 16-13, 16-20, 16-21. Except where complaints of unsafe conditions at the site of regulated companies are substantiated in a proceeding conducted pursuant to § 16-13, however, action taken by the PUC upon these procedures is, again, merely discretionary. See n.21, infra.

S. Ct. 901, 8 L. Ed. 2d 54; *Carnation Co.* v. *Pacific Westbound Conference,* 383 U.S. 213, 221–22, 86 S. Ct. 781, 15 L. Ed. 2d 709; Miron, 43 A.B.A. Antitrust L.J. 329, 333; King, "The 'Arguably Lawful' Test of Primary Jurisdiction in Antitrust Litigation Involving Regulated Industries," 40 Tenn. L. Rev. 617, 624–31; Kestenbaum, "Primary Jurisdiction to Decide Antitrust Jurisdiction: A Practical Approach to the Allocation of Functions," 55 Geo. L.J. 812.

## B

Implied power on the part of the PUC to determine the defendant's liability under the act cannot be inferred from any of the pertinent provisions of the Public Service Companies Act. Such power can be implied only in cases of "plain repugnancy" between the regulatory scheme and the antitrust law. *Otter Tail Power Co.* v. *United States,* 410 U.S. 366, 372, 93 S. Ct. 1022, 35 L. Ed. 2d 359, reh. denied, 411 U.S. 910, 93 S. Ct. 1523, 36 L. Ed. 2d 201; *United States* v. *Philadelphia National Bank,* 374 U.S. 321, 350–51, 83 S. Ct. 1715, 10 L. Ed. 2d 915; see also King, op. cit., pp. 648–49 n.143. The necessary repugnancy is sometimes found to be inherent in the fact, inter alia, that the regulatory scheme in question was enacted after the antitrust law in question went into effect (although such "repeals" of the antitrust laws are "strongly disfavored"); *Ricci* v. *Chicago Mercantile Exchange,* 409 U.S. 289, 301, 93 S. Ct. 573, 34 L. Ed. 2d 525, reh. denied, 410 U.S. 960, 93 S. Ct. 1411, 35 L. Ed. 2d 697; *Otter Tail Power Co.* v. *United States,* supra; *United States* v. *Philadelphia National Bank,* supra; or where the agency is under a specific obligation to consider the potentially anticompetitive effects of a practice proposed

by an organization subject to its regulatory powers before formally approving such practices as required nonetheless by the public interest; *Gulf States Utilities Co.* v. *Federal Power Commission,* 411 U.S. 747, 759–60, 93 S. Ct. 1870, 36 L. Ed. 2d 635, reh. denied, 412 U.S. 944, 93 S. Ct. 2767, 37 L. Ed. 2d 405; *California* v. *Federal Power Commission,* supra, 485–86; *United States* v. *Radio Corporation of America,* 358 U.S. 334, 351, 79 S. Ct. 457, 3 L. Ed. 2d 354; *Sabin* v. *Butz,* 515 F.2d 1061 (10th Cir.). This was the theory underlying, in part, the dispositions of such cases as, e.g., *Carter* v. *American Telephone & Telegraph Co.,* 365 F.2d 486, 496 (5th Cir.); *Macom Products Corporation* v. *American Telephone & Telegraph Co.,* 359 F. Sup. 973, 976 (C.D. Cal.); and *Chastain* v. *American Telephone & Telegraph Co.,* 351 F. Sup. 1320, 1323 (D. D.C.), where the court referred antitrust attacks upon activities authorized by telephone company tariffs to the "primary jurisdiction" of the federal communications commission upon concluding that the FCC was required by specific provisions of the Federal Communications Commission Act to determine whether the "rates," "services," "charges" and "practices" of a regulated telephone company were "just," "reasonable" and "lawful," or otherwise in the "public interest," in order for such rates, services, charges or practices to remain in force.

In this case, the Public Service Companies Act provisions in question antedated the enactment of the Connecticut Anti-Trust Act, so that no "repeal" of the latter can be inferred therefrom. Moreover, the PUC has no obligation under the Public Service Companies Act to take into account the possibly anticompetitive effects of proposed tariffs filed with

the commission prior to granting its approval. Rather, whether the PUC decides to approve or modify a tariff pursuant to the provisions of § 16-19 upon a finding that any "rate" is "unreasonably discriminatory or more or less than just, reasonable and adequate to enable such company to provide properly for the public convenience, necessity and welfare," or that a "service" is "inadequate or excessive," is wholly within its discretion. *New Haven* v. *New Haven Water Co.*, 132 Conn. 496, 509-10, 45 A.2d 831; see also discussion, supra, section III, part A, subsection 2. Determinations of the continuing validity of rates and services pursuant to §§ 16-9, 16-20 and 16-21 are similarly discretionary.[21] Cf. *Carter* v. *American Telephone & Telegraph Co.*, supra, 496; *Macom Products Corpo-*

---

[21] "[General Statutes] Sec. 16-9. ORDERS. All decisions, orders and authorizations of the commission shall be in writing and shall specify the reasons therefor, shall be filed and kept in the office of the commission and recorded in a book kept by it for that purpose and shall be public documents. Said commission may, at any time, for cause shown, upon hearing had after notice to all parties in interest, rescind, reverse or alter any decision, order or authorization by it made. Written notice of all orders, decisions or authorizations issued by the commission shall be given to the company or person affected thereby, by personal service upon such company or person or by registered or certified mail, as the commission determines."

"[General Statutes] Sec. 16-20. RATES AND SERVICE AFFECTING A SINGLE PERSON. If any public service company unreasonably fails or refuses to furnish adequate service at reasonable rates to any person within the territorial limits within which such company has, by its charter, authority to furnish such service, such person may bring his written petition to the commission alleging such failure or refusal. Thereupon the commission shall fix a time and place for a hearing upon such petition and shall mail notice thereof to the parties in interest at least one week prior to such hearing. Upon such hearing, the commission may, if it finds that such company has unreasonably failed or refused to furnish such person with adequate service at reasonable rates, prescribe the service to be furnished by such company to such person and the conditions under which, and maximum rates or charges at which, such service shall be furnished. Such company shall thereafter furnish such service to such person in

_ration_ v. _American Telephone & Telegraph Co._, 359
F. Sup. 973, 976 (C.D. Cal.); _Miller_ v. _New York
Telephone Co._, 2 P.U.R. 4th 411, 415 (construing
article 5 of the New York Public Service Law).

In sum, no "repeal" of the Connecticut Anti-Trust
Act can be inferred from the provisions of the
Public Service Companies Act. Nor is there any
binding requirement on the part of the PUC to
take into account antitrust law policies when
reviewing the validity of such activities of a regu-
lated telephone company as those purportedly
authorized by the defendant telephone company's
tariff in this case. Accordingly, we find no "plain
repugnancy" between the Connecticut Anti-Trust
Act and the Public Service Companies Act war-
ranting a conclusion that the PUC has an "implied"

accordance with the conditions so prescribed and shall not thereafter
demand or collect any rate or charge for such service in excess of
the maximum rate or charge so prescribed. This section shall be
construed to include telephone exchange areas."

"[General Statutes] Sec. 16-21. CHANGE OF RATES FIXED PURSUANT
TO CHARTER OR CONTRACT. Whenever any rate of any public service
company chartered by or organized under the laws of this state exists
or is charged pursuant to charter, contract or any agreement or
understanding, and is in whole or in any respect discriminatory or
more or less than just, reasonable and adequate to provide properly
for the public convenience, necessity and welfare, such company or
any town, city or borough within which, or between which and any
other town, city or borough in this state, any such company is fur-
nishing service, or any ten patrons of any such company, may bring
a written petition to the commission alleging that such rate is dis-
criminatory or more or less than just, reasonable and adequate.
Thereupon the commission shall fix a time and place for a hearing
upon such petition and shall mail notice thereof to the parties in
interest and give public notice thereof at least one week prior to
such hearing. Upon such hearing, the commission may, if it finds
such rate to be discriminatory or more or less than just, reasonable
and adequate to enable such company to provide properly for the
public convenience, necessity and welfare, determine and prescribe
just and reasonable maximum rates or charges to be thereafter made
by such company."

power to exempt from antitrust liability the kind of activities of a telephone company which are involved in this case to the extent that jurisdiction in the PUC of the subject matter of this controversy can be said to be "primary." *Gulf States Utilities Co.* v. *Federal Power Commission,* supra; *Ricci* v. *Chicago Mercantile Exchange,* supra, 301; *United States* v. *Philadelphia National Bank,* supra.

## C

The courts in *Carter, Macom Products,* and *Chastain,* supra, in referring the antitrust controversies therein to the primary jurisdiction of the FCC, also attached great significance to the fact that specific procedures existed empowering the plaintiffs to raise before the commission factual issues of decisive importance to the resolution of the antitrust suits in question. *Carter* v. *American Telephone & Telegraph Co.,* supra, 499 n.27; *Macom Products Corporation* v. *American Telephone & Telegraph Co.,* supra, 976; *Chastain* v. *American Telephone & Telegraph Co.,* supra, 1323, citing *Carter,* supra; cf. *Ricci* v. *Chicago Mercantile Exchange,* supra, 304–305 n.14. However, there is no way that a person in the plaintiff's position can raise before the PUC any of the critical factual questions in this case arguably within the PUC's competence, viz., whether the activities of the telephone company challenged in this case are so essential to the public interest as to override any possibly anticompetitive effects on the communications industry in the private sector of the economy, or whether the privately obtained devices secured by the plaintiff would in some way be harmful to the defendant's network. See *Macom Products Corporation* v. *American Telephone & Telegraph*

*Co.,* 359 F. Sup. 973 (C.D. Cal.). A procedure authorizing "written petition to the commission alleging that . . . [a] rate is discriminatory or more or less than just, reasonable and adequate" to enable the company involved "to provide properly for the public convenience, necessity and welfare" is provided by § 16-21, but is available only to "such company" or to "any ten patrons of any such company."[22] What specific rights the plaintiff does have as an individual to complain about the general practices of a regulated company are contained in § 16-20, which strictly limits the scope of such complaints to attacks upon a "rate" charged by the company as "unreasonable" or upon a "service" provided as "inadequate."[23] Cf. *Carter* v. *American Telephone & Telegraph Co.,* 365 F.2d 486, 499 n.27 (5th Cir.); *Macom Products Corporation* v. *American Telephone & Telegraph Co.,* supra. Nor, finally, do any of the provisions of Connecticut's Uniform Administrative Procedure Act (UAPA) authorize an individual in the plaintiff's position to secure from an agency like the PUC a definitive ruling on questions such as those at the heart of this case. See, e.g., the restrictions inherent in the procedures created by §§ 4-174 and 4-176 of the UAPA; cf. *Carter* v. *American Telephone & Telegraph Co.,* supra. Thus, even if the PUC were in a peculiarly advantageous position to determine a factual issue which could be of material assistance to the court in resolving the question of the defendant's antitrust liability; *Chicago Mercantile Exchange Co.* v.

---

[22] See note 21, supra. The plaintiff as an individual is similarly not specifically entitled to participate in a proceeding initiated by the PUC sua sponte under § 16-9.

[23] See note 21, supra. Similarly, proceedings conducted pursuant to § 16-13 are limited to the airing of complaints of unsafe conditions at the site of a regulated company.

*Deaktor,* 414 U.S. 113, 115, 94 S. Ct. 466, 38 L. Ed. 2d 344; *Federal Maritime Board* v. *Isbrandtsen Co.,* 356 U.S. 481, 498, 78 S. Ct. 851, 2 L. Ed. 2d 926; there presently exists no procedure entitling the plaintiff in this case to have that issue adjudicated before the PUC. *Ricci* v. *Chicago Mercantile Exchange,* supra, 304–305 n.14; *Carter* v. *American Telephone & Telegraph Co.,* supra; *Macom Products Corporation* v. *American Telephone & Telegraph Co.,* supra.

## IV

Neither the Public Service Companies Act nor the Connecticut Anti-Trust Act expressly or impliedly confers power upon the PUC to immunize from antitrust liability activities such as those complained of in this case. Moreover, no procedure exists empowering the plaintiff to raise before the PUC the kind of factual issue whose determination would be of crucial importance to the court in its resolution of the antitrust controversy. Accordingly, the trial court should not have declined to take jurisdiction of this controversy on the grounds stated.

The case is remanded to the Superior Court for further action according to law.

In this opinion MacDonald, Longo, and Speziale, Js., concurred.

House, C. J. (dissenting). I do not agree with the conclusion reached in the majority opinion and think that an order should be entered dismissing the appeal since it is not taken from a final judgment—or from any judgment whatsoever. It is an appeal from an interlocutory ruling of a judge of the Superior Court denying an application for a

temporary injunction and from time immemorial it has been held that no appeal lies from such an interlocutory ruling of a judge. This holding is in accord with the provisions of § 600 of the Practice Book and § 52-263 of the General Statutes which only authorize appeals to this court "from the final judgment of the court or of such judge."

The law as it has been established up until the present decision was well expressed by Chief Justice King in *Devine Bros., Inc.* v. *International Brotherhood,* 145 Conn. 77, 79, 139 A.2d 60. In that case the trial court issued a temporary injunction forbidding the picketing of the plaintiff's place of business until there would be a trial on the merits and the defendant appealed on many grounds. This court, in a unanimous opinion, stated the law thusly: "At the outset we are faced with a jurisdictional question as to whether an appeal is possible in this case. This question must be resolved before we can consider the appeal on the merits. *Riley* v. *Board of Police Commissioners,* 145 Conn. 1, 6, 137 A.2d 759. The taking of an appeal from the granting or denial of a temporary injunction is ordinarily impossible, since such an order is not a final judgment. *Olcott* v. *Pendleton,* 128 Conn. 292, 295, 22 A.2d 633. . . . [S]uch an appeal lies if, but only if, the injunction was granted in a case 'involving or growing out of a labor dispute.' *H. O. Canfield Co.* v. *United Construction Workers,* 134 Conn. 358, 360, 57 A.2d 624. Unless the present case falls in that category, this appeal must be dismissed."

In the present case, the plaintiff sought a temporary and a permanent injunction by a writ, summons and complaint dated August 27, 1974, and returnable to the Superior Court in Windham

County on the third Tuesday of September, 1974. On August 27, 1974, *Barber, J.,* acting as a judge of the Superior Court, issued an order to the defendant to appear on September 5, 1974, "to show cause why a temporary injunction should not be issued against you as prayed for in said complaint and application." There followed next a memorandum of decision signed by *Driscoll, J.,* dated September 14, 1974. That memorandum commences with this statement: "This matter is before the court in response to an order to show cause why a temporary injunction should not be issued as prayed for in a complaint and application as filed with the Superior Court," and notes that "[a]part from the complaint and the previously referred to order to show cause there has been no further pleadings in this matter." The memorandum of decision concluded with this sentence: "Accordingly, the relief sought herein is denied without prejudice."

Not only were the pleadings never closed but no judgment whatsoever was ever entered and, for obvious reasons in this state of the record, no finding ever requested or filed. The only action taken by the presiding judge was to make an interlocutory ruling which denied "without prejudice" the application for a temporary injunction. Under our heretofore settled law, no appeal lies from such an interlocutory ruling and the majority opinion cites no authority of this court to the contrary.

It suffices to conclude with a quotation from the opinion of Chief Justice Maltbie in *Marcil* v. *Merriman & Sons, Inc.,* 115 Conn. 678, 682, 163 A. 411: "There is no warrant in law for such an appeal as the one before us. Whenever the absence of juris-

diction of a proceeding is brought to the notice of a court, cognizance of the fact must be taken and the matter determined before it can move a further step in the case. *Woodmont Asso.* v. *Milford,* 85 Conn. 517, 524, 84 A. 307. Jurisdiction to entertain a particular proceeding cannot be conferred by waiver or consent. *McDonald* v. *Hugo,* 93 Conn. 360, 364, 105 A. 709; *Savings Bank of Danbury* v. *Downs,* 74 Conn. 87, 89, 49 A. 913. Where there is no judgment or ruling from which an appeal can be taken, the attempted appeal must be dismissed, either on motion of the parties or by the court upon its own motion. *In re Application of Title & Guaranty Co.,* 109 Conn. 45, 51, 145 A. 151. In *Russell Lumber Co.* v. *Smith & Co.,* 82 Conn. 517, 74 A. 949, there was an attempt to appeal from the denial of a motion for a stay of execution; examination of the record of the case shows that no motion to dismiss the appeal or similar proceeding was taken; the court, however, refused to entertain the appeal. We said: 'The statute provides for appeals only from final judgments. The present appeal is not from such a judgment. It was therefore unwarranted and improper, and gives to this court no jurisdiction over the case. The appeal is erased from the docket.' These decisions mark out our proper course."

The appeal from the denial, without prejudice, of the plaintiff's application for a temporary injunction should be dismissed.